[No. G036583. Fourth Dist., Div. Three. May 23, 2007.]

JOSEPH MELICAN, Plaintiff and Appellant, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendant and
Respondent.

MAUREEN KENNEDY et al., Plaintiffs and Appellants, v.
THE REGENTS OF THE UNIVERSITY OF CALIFORNIA, Defendent and
Respondent.

COUNSEL

Law Offices of Federico Castelan Sayre, Federico Castelan Sayre and James F. Rumm for Plaintiffs and Appellants.

Marlin & Saltzman, Louis M. Marlin and Dale A. Anderson for Defendant and Respondent.

OPINION

**ARONSON, J.**—Plaintiffs Joseph Melican, Maureen Kennedy, and Robert Melican appeal from a judgment following the trial court's order sustaining demurrers by the Regents of the University of California (Regents) to their breach of contract cause of action, and granting summary judgment on plaintiffs' claims of negligence and negligent misrepresentation. Plaintiffs based their claims on the alleged mishandling of George Melican's remains

by the Willed Body Program (WBP) operated by the University of California, Irvine (UCI). Plaintiffs contend UCI breached its agreement to return Melican's cremated remains (cremains) because the cremains they received contained metal snaps for clothing the decedent did not wear. Plaintiffs also contend UCI owed them a legal duty to ensure the cremains returned to the family were not commingled with those of another person. Finally, plaintiffs contend they raised triable issues of fact concerning whether UCI misrepresented that the cremains given to the family were those of Melican, that UCI would use the body for cancer research exclusively, and that UCI would use donations raised by the Melican family for cancer research.

■ We conclude UCI did not owe a contractual or legal duty to ensure Melican's cremains had not been commingled with other cremains before returning them to Melican's family. UCI honored the family's request to return the remains voluntarily, and not as a contractual obligation. UCI never undertook to perform funeral-related services for family members, and did not owe family members the same duties the law imposes on mortuaries, cemeteries, or crematories. Plaintiffs' negligent misrepresentation claims fail because (a) some of the claims were not pleaded in the operative complaints, and (b) none of the plaintiffs could have relied on the alleged misrepresentations because they did not hold the legal right to control the disposition of Melican's body. Accordingly, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

After Melican's death in July 1999, his widow, Patricia,[1] donated his body to the WBP. Under the donation agreement Patricia signed, she did *not* request that UCI return the remains to her for final disposition. Rather, she elected to have UCI dispose of the body "in accordance [with] California State Law." After the body was used in the WBP, Roosevelt Memorial Park cremated Melican's remains at UCI's request in August 1999.

On September 17, 1999, UCI issued a press release acknowledging irregularities in the WBP and admitted in some cases poor recordkeeping prevented it from returning remains to family members. After reading newspaper stories about UCI's mismanagement of the WBP, Melican's son, Joseph, contacted

---

[1] We refer to members of George Melican's family by their first names for clarity and ease of reference, and intend no disrespect. (See *In re Marriage of Olsen* (1994) 24 Cal.App.4th 1702, 1704, fn. 1 [30 Cal.Rptr.2d 306].)

UCI and requested information about his father's remains. UCI's Penny Brossard responded that Melican's cremated remains were at the WBP laboratory, and either could be returned to the family or scattered at sea. Joseph arranged for delivery of the cremains to Patricia's home. Suspecting the cremains were not Melican's, the family retained Homer Campbell, a forensic dentist, to examine them. Among other things, Campbell discovered six metal button snaps among the cremains. Melican's body, however, was not clothed when UCI took possession of the body or when it was cremated.

Joseph joined a pending suit against the Regents in January 2000 (*Coghill v. Regents* (Super. Ct. Orange County, No. 814953)). After the trial court sustained demurrers to causes of action for, inter alia, breach of contract and negligent misrepresentation, the plaintiffs in that case filed a second amended complaint seeking damages for negligence and injunctive relief against the Regents.

Melican's siblings, Robert and Maureen, filed a separate action in September 2000 (*Ciancio v. Regents* (Super. Ct. Orange County, No. 00CC10682)). After the trial court sustained a demurrer to their breach of contract claim, Robert and Maureen filed a third amended complaint, which included causes of action against the Regents for negligence and negligent misrepresentation. Patricia, Melican's widow, did not sue the Regents.

The trial court consolidated the two cases, and the Regents subsequently moved for summary judgment. Included in the evidence opposing the motion was Campbell's declaration stating he found the six metal snap-type buttons in the returned cremains and evidence the body was unclothed both at the time UCI took possession of the body and when it was cremated.[2] In addition, plaintiffs submitted a certified copy of Melican's death certificate indicating his ashes had been scattered at sea before they purportedly were returned to the family.

The trial court granted summary judgment, and plaintiffs filed a new trial motion. In opposing the new trial motion, the Regents introduced a recently obtained copy of Campbell's forensic report in which he concluded "[t]hese cremains are positively those of George M[e]lican." Campbell based his conclusion on the decedent's "extensive crown and bridge restorations, all of which were recovered from the cremains." The trial court denied the plaintiffs' new trial motion, and entered judgment in UCI's favor. Plaintiffs now

---

[2] Plaintiffs also introduced the declaration of a private investigator stating the buttons most likely came from a Wrangler brand western-style shirt, and declarations of family members that Melican never wore western-style shirts. The trial court sustained objections to the foregoing evidence, and plaintiffs do not challenge the propriety of the trial court's evidentiary rulings.

appeal the trial court's orders sustaining demurrers to the breach of contract cause of action in Robert and Maureen's second amended complaint, and granting summary judgment as to plaintiffs' claims for negligence and negligent misrepresentation.

## II

### DISCUSSION

### A. *Breach of Contract*

#### 1. *The Trial Court Properly Sustained Demurrers to the Breach of Contract Cause of Action*

The second amended complaint of Robert and Maureen concerned UCI's handling of not only Melican's cremains, but also those of 12 other decedents. As to Melican, the complaint alleges he arranged for, and the family specifically requested, UCI to return his remains to the family after use by the WBP. It further alleges "JOSEPH MELICAN has received remains which Defendants purported to be those of his father GEORGE MELICAN, but which can not be verified as the remains of GEORGE MELICAN."

■ It is well settled a pleader must state with certainty the facts constituting a breach of contract. (*Gautier v. General Telephone Co.* (1965) 234 Cal.App.2d 302 [44 Cal.Rptr. 404]; 4 Witkin, Cal. Procedure (4th ed. 1997) Pleading, § 495, pp. 585–586.) An allegation that Melican's remains cannot be verified is insufficient to allege UCI's breach of its agreement to return his remains. In other words, an allegation that a defendant *might have* breached a contract does not state a valid cause of action. True, the third amended complaint generally alleges breach concerning UCI's handling of all 13 decedents: "The Defendants breached said contracts by not returning the remains of decedents and/or by failing to cremate the remains and scatter them so that a proper and respectful disposition could be made. Defendants further breached said contracts [by not] maintaining proper records of identification so that the identity of each decedent was preserved and a proper and respectful disposition could be made of each decedent's remains . . . ."

■ These general allegations, however, do not supersede those specifically relating to Melican. As one court observed: "[G]eneral pleadings are controlled by specific allegations. . . . [¶] For example, where plaintiff alleges a permissible conclusion of law such as the due performance of a condition

precedent but also avers specific additional facts which either do not support such conclusion, or are inconsistent therewith, such specific allegations will control 'and a complaint which might have been sufficient with general allegations alone may be rendered defective . . . .' [Citations.]" (*Careau & Co. v. Security Pacific Business Credit, Inc.* (1990) 222 Cal.App.3d 1371, 1389–1390 [272 Cal.Rptr. 387].) Because the allegations specifically relating to Melican's remains did not state a cause of action for breach of contract, the trial court did not err in sustaining demurrers to the claim.

### 2. *The Trial Court Did Not Err in Denying Leave to Amend*

At the summary judgment hearing, plaintiffs dropped their claim that Melican had arranged for UCI to return his remains to the family, and conceded Melican's widow, who made the WBP donation, did not request UCI to return her husband's remains. At the hearing, however, plaintiffs orally moved to amend their complaints to add a new breach of contract claim alleging that UCI formed a new contract in September 1999 when it agreed with Joseph to return his father's remains to the family. Plaintiffs contend the trial court abused its discretion when it denied leave to amend. We disagree.

" '[T]he trial court has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown. [Citations.]' " (*Record v. Reason* (1999) 73 Cal.App.4th 472, 486 [86 Cal.Rptr.2d 547].) Nevertheless, it is also true that courts generally should permit amendment to the complaint at any stage of the proceedings, up to and including trial. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761 [135 Cal.Rptr.2d 433]; *Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 487 [55 Cal.Rptr.2d 225].) But this policy applies " 'only "[w]here no prejudice is shown to the adverse party." ' " (*Atkinson v. Elk Corp., supra,* 109 Cal.App.4th at p. 761.) Moreover, " ' "even if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." ' " (*Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746 [41 Cal.Rptr.3d 754] (*Huff*); see *Record v. Reason, supra,* 73 Cal.App.4th at p. 486.) Thus, appellate courts are less likely to find an abuse of discretion where, for example, the proposed amendment is " 'offered after long unexplained delay . . . or where there is a lack of diligence . . . .' " (*Hulsey v. Koehler* (1990) 218 Cal.App.3d 1150, 1159 [267 Cal.Rptr. 523].)

For example, in *Huff,* three days before the scheduled hearing on the defendant's summary judgment motion, the plaintiff requested an order shortening time to bring a motion to amend his complaint to add a new claim and to continue the summary judgment hearing. *Huff* concluded the trial court

did not abuse its discretion in denying the plaintiff's request, noting plaintiff gave no explanation for the delay in seeking to amend. The court further recognized that based on the undisputed facts presented, no liability would lie under the new claim. (*Huff, supra,* 138 Cal.App.4th at p. 746.)

Here, plaintiffs were aware of the facts underlying the purported contract between Joseph and UCI from the time the agreement allegedly was formed. Consequently, this claim should have been pleaded when Joseph was added as a party to the action in January 2000. Yet, plaintiffs never sought to add the claim until they made their oral request during the summary judgment hearing over five years later. Plaintiffs proffer no explanation for this clearly unreasonable delay. It would be patently unfair to allow plaintiffs to defeat UCI's summary judgment motion by allowing them to present a "moving target" unbounded by the pleadings.

Plaintiffs' reliance on *Kirby v. Albert D. Seeno Construction Co.* (1992) 11 Cal.App.4th 1059 [14 Cal.Rptr.2d 604] (*Kirby*) is misplaced. In *Kirby,* the defendant obtained summary judgment based on a concession purportedly made in the plaintiff's complaint showing the statutes of limitation had run. The appellate court in *Kirby* noted the summary judgment motion, unsupported by declarations or other evidence, operated as a motion for judgment on the pleadings. In reversing, the court concluded: "Where the complaint is challenged and the facts indicate that a plaintiff has a good cause of action which is imperfectly pleaded, the trial court should give the plaintiff an opportunity to amend." (*Id.* at p. 1067.)

The present situation is markedly different from that in *Kirby.* Here, plaintiffs' breach of contract claim was not "imperfectly pleaded"; it was not pleaded at all. Also, the moving defendant in *Kirby* relied solely on the pleadings, but the Regents based their summary judgment motion on extrinsic evidence. Thus, no basis exists to consider the Regent's summary judgment motion as seeking judgment on the pleadings.

■ Moreover, based on the facts presented, Joseph's new breach of contract claim does not appear viable. It is axiomatic that consideration must support every contract. (Civ. Code, § 1550, subd. (4).) Consideration sufficient to support a contract is defined as: "Any benefit conferred, or agreed to be conferred, upon the promisor, by any other person, to which the promisor is not lawfully entitled, or any prejudice suffered, or agreed to be suffered, by such person, other than such as he is at the time of consent lawfully bound to

suffer, as an inducement to the promisor, is a good consideration for a promise." (Civ. Code, § 1605; see *Estate of Bray* (1964) 230 Cal.App.2d 136, 141 [40 Cal.Rptr. 750].) Plaintiffs contend they provided consideration by relieving UCI of its legal obligations under the donation card that UCI dispose of the cremains "in accordance to California State Law." We disagree.

■ UCI informed Joseph he could choose between having his father's ashes returned to the family or scattered at sea. Either option would fulfill UCI's legal and contractual obligation to dispose of the remains in accordance with "California State Law." Specifically, the law allows cremains to be disposed by, inter alia, either scattering them at sea or by "inurnment," which is defined as "placing cremated remains in a container suitable for placement, burial, or shipment." (See Health & Saf. Code, §§ 7009, 7011, 7116.) Accordingly, when UCI cremated Melican's remains, packaged them, and returned them to the family, it had disposed of the remains in accordance with the law as required by the donation agreement. True, UCI was not contractually required to return the remains to the family, but complying with Joseph's request was not inconsistent with UCI's preexisting obligations and therefore did not alter the agreement between Melican's widow and UCI.[3] Thus, the trial court did not abuse its discretion in denying plaintiffs' 11th-hour request for leave to amend.

B. *The Trial Court Did Not Err in Granting Summary Judgment*

 1. *Negligence*

■ Civil Code section 1714, subdivision (a), provides: "Everyone is responsible, not only for the result of his or her willful acts, but also for an injury occasioned to another by his or her want of ordinary care or skill in the management of his or her property or person, except so far as the latter has, willfully or by want of ordinary care, brought the injury upon himself or herself." Liability for one's failure to exercise ordinary care, however, is not boundless. Limitations may arise if grounded either in statute or public policy. (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 896–898 [2 Cal.Rptr.2d 79, 820 P.2d 181] (*Christensen*).) Public policy limitations are often expressed by defining the scope of persons to whom the defendant owes a duty. (See *Thing v. La Chusa* (1989) 48 Cal.3d 644, 668 [257 Cal.Rptr. 865, 771 P.2d 814] (*Thing*).)

---

[3] We recognize the donation agreement form includes the following footnote: "Note: With final disposition, the cremated remains will NOT be returned to the family unless the Disposition form is completed and signed." This footnote simply provides notice to the donor that UCI would not be obligated to return the cremated remains, and does not bar UCI from voluntarily doing so if it chooses to honor a later request from the family.

■ Whether a defendant owes a duty to a particular plaintiff is a question of law. (*Richards v. Stanley* (1954) 43 Cal.2d 60, 66–67 [271 P.2d 23].) " '[I]n considering the existence of "duty" in a given case several factors require consideration including "the foreseeability of harm to the plaintiff, the degree of certainty that plaintiff suffered injury, the closeness of the connection between the defendant's conduct and the injury suffered, the moral blame attached to the defendant's conduct, the policy of preventing future harm, the extent of the burden to the defendant and consequences to the community of imposing a duty to exercise care with resulting liability for breach, and the availability, cost, and prevalence of insurance for the risk involved.["] ' [Citation.]" (*Christensen, supra*, 54 Cal.3d at pp. 885–886.) Thus, although foreseeability is an important factor, it alone does not always define duty.

For example, in *Thing*, the Supreme Court denied recovery to a mother for emotional distress she suffered upon learning her child had been injured because she was not present when the accident occurred. Although it is foreseeable a mother will suffer emotional distress upon learning of her child's injury, the court allowed recovery only under limited circumstances: "[A] plaintiff may recover damages for emotional distress caused by observing the negligently inflicted injury of a third person if, but only if, said plaintiff: (1) is closely related to the injury victim; (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim; and (3) as a result suffers serious emotional distress—a reaction beyond that which would be anticipated in a disinterested witness and which is not an abnormal response to the circumstances." (*Thing, supra*, 48 Cal.3d 644 at pp. 667–668, fns. omitted.)

■ *Christensen*, however, declined to apply the limitations announced in *Thing* to a suit by relatives and friends of deceased persons whose bodies were mishandled by a mortuary and crematory. Although none of the plaintiffs were present when the mishandling occurred, the court nonetheless held the defendants had a duty to avoid causing emotional distress to those plaintiffs on whose behalf or for whose benefit their services were rendered. The court explained: "In *Thing* . . . we restricted recovery to close relatives who are percipient witnesses to the negligent injury of the tortfeasor's immediate victim in order to avoid unlimited liability out of all proportion to the culpability of the negligent actor, and in recognition that the percipient witness usually suffers an emotional impact beyond that suffered whenever one learns from another of the death or injury of a loved one. [Citation.] Here, by contrast, the emotional injury is suffered by persons for whom the defendants have undertaken to provide a service, the very purpose of which is

to alleviate existing and avoid future emotional distress arising from the death. The concerns which justified the restrictions that defendants' urge us to extend to this case are not present. *The potential plaintiffs are limited to those for whom defendants performed a service."* (*Christensen, supra,* 54 Cal.3d at pp. 899–900, italics added.)

 Here, plaintiffs urge we impose on UCI the duties undertaken by the mortuary and crematory defendants in *Christensen.* Specifically, plaintiffs argue that "the moment that the Regents assumed the duty to deliver the remains of Melican to his family, the Regents simultaneously undertook the duty to do so as a reasonably prudent mortuary service provider." We disagree that UCI, by agreeing to return Melican's cremains, assumed the duties of a mortuary service provider. UCI does not purport to provide funeral-related services, and is not licensed to do so. "[F]uneral-related services are principally for the comfort of the living, having as their aim the consolation of the leading mourners. The expectations of the survivors, and 'essence of the contract [for such services is] a reasonable expectation of dignity, tranquility, and personal consolation.' [Citation.]" (*Christensen, supra,* 54 Cal.3d at p. 887, fn. 17.) In contrast, the mission of UCI's WBP is to obtain cadavers for study and dissection by medical students. In recognition of this distinction, the Legislature specifically exempted public institutions, hospitals, and medical schools from the Funeral Directors and Embalmers Law. (Bus. & Prof. Code, § 7609.)

Of course, one may undertake a duty from which one is exempt by law, but plaintiffs presented no evidence UCI assumed a duty *to act as a mortuary or provider of funeral-related services.* Plaintiffs point to an "Application and Permit for Disposition of Human Remains" that UCI filed with the Orange County Health Care Agency upon picking up Melican's body from Patricia Melican soon after his death. The preprinted form, which is generated by the Department of Health Services, includes a list of "Authorized Disposition(s)" and, in this section, a UCI representative checked the box "Scientific Use." In asserting that UCI is a mortuary, plaintiffs rely on the "Applicant" box on the form, which includes the heading: "Typed Name and Address of California— Funeral Director or Person Acting as Such." The name listed there is "UCI College of Medicine."[4] The bare "Funeral Director or Person Acting as Such" language on this form is not evidence that UCI undertook, with respect to plaintiffs, a duty to act as a mortuary or funeral home because there is no evidence the plaintiffs knew of or relied on the form in accepting UCI's representation that it would return Melican's body to the family. Indeed, it appears UCI put its name in that particular box simply because there was no more suitable place on the form to do so.

---

[4] Notably, the next box on the form calls for what is presumably a funeral home or mortuary "Calif. License Number—if Applicable"; this box is marked "None."

Concluding UCI does not owe the same duties as a mortuary or crematory, however, does not resolve whether UCI owed plaintiffs a duty of care to avoid causing emotional distress. We consider this issue in light of plaintiffs' claims. Here, plaintiffs contend that by offering to return Melican's cremains, UCI owed each of them a duty to exercise reasonable care to ensure that the proper cremains were returned. In opposing summary judgment, plaintiffs asserted UCI breached that duty by returning cremains that were not those of Melican. In connection with plaintiffs' motion for new trial, however, the Regents introduced a report in which plaintiffs' own expert opined that the cremains returned "are positively those of George M[e]lican." Plaintiffs' counsel conceded in oral argument his expert established the remains were those of Melican, and we therefore need not address this issue. Plaintiffs' counsel redefined the issue as "[w]hether or not these were his remains solely." He explained the presence of the metal snaps in the cremains raised a triable issue of fact that "there might have been another person commingled." We accept counsel's recrafting of the issue on appeal. (See *Franklin v. Appel* (1992) 8 Cal.App.4th 875, 893, fn. 11 [10 Cal.Rptr.2d 759].) With this in mind, we consider whether UCI owed the plaintiffs a duty not to commingle Melican's cremains before returning them to decedent's family. We conclude they did not.

■ As noted above, UCI had no contractual duty to return Melican's cremains to the family at all, and did not agree to keep his remains segregated from those of other WBP bodies. Thus, in cremating the decedent's body, UCI was bound only to do so in accordance with state law. As recognized in *Bennett v. Regents of University of California* (2005) 133 Cal.App.4th 347, 357 [34 Cal.Rptr.3d 579] (*Bennett*), cremations performed by UCI under the WBP are exempt from Health and Safety Code section 7054.7, requiring individual cremations. Accordingly, UCI breached no duties if commingling had occurred.

We are left then to consider whether UCI owed a duty to plaintiffs when Joseph requested the return of Melican's remains. Did UCI have a duty to perform a forensic investigation of the cremains or research the crematory's handling of the body to ensure no commingling had occurred before returning them? The answer is no.

True, returning commingled remains to a loved one might foreseeably cause emotional distress. But, as noted above, foreseeability is only one part of the duty equation. " '[T]here are clear judicial days on which a court can foresee forever and thus determine liability but none on which that foresight alone provides a socially and judicially acceptable limit on recovery of damages for [an] injury.' [Citation.] In short, foreseeability is not synonymous with duty; nor is it a substitute." (*Erlich v. Menezes* (1999) 21 Cal.4th

543, 552 [87 Cal.Rptr.2d 886, 981 P.2d 978].) Even where not mishandled, bodies donated to the WBP are routinely subjected to treatment that could foreseeably cause emotional distress to family members. As the court in *Bennett* observed: "According to the undisputed deposition testimony, 90 to 95 percent of the donors were subject to gross anatomical dissection, with different body parts being removed and taken to different departments as needed (e.g., dentistry, neurology or orthopedics). Without dwelling excessively on the details, it is difficult to imagine how a cadaver that has been segmented and reduced for anatomical study, organ-by-organ, muscle-by-muscle, bone-by-bone, can be reconstituted at the completion of the study. Realistically, some parts (e.g., a brain that is being examined for the effects of Alzheimer's disease) would be studied far longer than other parts, or perhaps kept indefinitely." (*Bennett, supra*, 133 Cal.App.4th at pp. 355–356.) Such treatment of dead bodies by a funeral home, crematory, or cemetery would in most cases subject them to both civil and criminal liability. But the Legislature has made a policy decision based on the importance of medical education and research that universities may act in the manner described above, and have expressly exempted them from the myriad of laws governing funeral directors.

As plaintiffs note, the donation agreement did not expressly authorize the commingling of Melican's remains. The agreement, however, did not foreclose this possibility. Although the Legislature has adopted laws affecting willed body programs, none requires a program to disclose to donors or family members the precise manner in which the donated body would be studied. For obvious reasons, the Legislature has not required disclosure of the undeniably gruesome details of gross anatomical dissection.

Finally, we note UCI had no obligation to return the remains but nonetheless honored the family's request. Imposing liability under these circumstances would naturally lead UCI and other universities to simply refuse to return remains to family members where not contractually required to do so, even if returning the remains would be a relatively simple task.

Considering all of the circumstances here, including the policy decisions underlying the Legislature's treatment of willed body programs, we conclude UCI had no duty to ensure the remains of Melican were free from commingling before returning them to Melican's family. Accordingly, plaintiffs have failed to show a triable issue of material fact relating to their negligence claim.

### 2. *Negligent Misrepresentation*

Negligent misrepresentation is a species of the tort of deceit and, like fraud, requires a misrepresentation, justifiable reliance and damage.

(*Alliance Mortgage Co. v. Rothwell* (1995) 10 Cal.4th 1226, 1239, fn. 4 [44 Cal.Rptr.2d 352, 900 P.2d 601].) "The elements of negligent misrepresentation are similar to intentional fraud except for the requirement of scienter; in a claim for negligent misrepresentation, the plaintiff need not allege the defendant made an intentionally false statement, but simply one as to which he or she lacked any reasonable ground for believing the statement to be true." (*Charnay v. Cobert* (2006) 145 Cal.App.4th 170, 184 [51 Cal.Rptr.3d 471].) Plaintiffs allege UCI made three misrepresentations: (1) it had the cremains of Melican and would return them upon Joseph's request; (2) UCI would use for cancer research the money received from the family's request in Melican's obituary for donations to "University Medical Services"; and (3) UCI would use Melican's body exclusively for cancer research.

The first misrepresentation, allegedly made to Joseph, is not listed in his operative second amended complaint. We therefore cannot consider the merits of a nonexistent cause of action. Further underscoring this point, the pleading seeks damages against the Regents only for negligence.[5] Although the operative third amended complaint of the other two plaintiffs does include a cause of action for negligent misrepresentation, the communications between Joseph and UCI regarding the return of Melican's remains is not mentioned. Instead, the claim relates to statements UCI allegedly made that induced plaintiffs to participate in the WBP. Moreover, no evidence was presented demonstrating Robert or Maureen relied on the statements UCI made to Joseph.

Similarly, the second misrepresentation above is not mentioned in either of the two operative pleadings. As noted above, plaintiffs have provided no excuse why they did not attempt to amend their pleadings before the hearing on the summary judgment motion. An appellate court's first step in reviewing a summary judgment is to " 'identif[y] the issues as framed by the pleadings.' " (*Turner v. Anheuser-Busch, Inc.* (1994) 7 Cal.4th 1238, 1252–1253 [32 Cal.Rptr.2d 223, 876 P.2d 1022].) We do not require the Regents to negate elements of causes of action plaintiffs never pleaded.

Regarding the third misrepresentation above, plaintiffs contend they based their "family decision" to donate Melican's body on UCI's promise it would use the body only for cancer research. This claim fails because none of the plaintiffs can demonstrate legal reliance. Patricia Melican was the sole dispositional rights holder with authority to decide whether to donate George's body (Health & Saf. Code, § 7100). Accordingly, she is the only person who could have detrimentally relied on UCI's alleged misrepresentations. She is not, however, a plaintiff in this case.

---

[5] Joseph's second amended complaint also seeks injunctive relief against the Regents, and restitution and injunctive relief against defendants other than the Regents.

## III

### DISPOSITION

The judgment is affirmed. UCI is entitled to its costs of this appeal.

Rylaarsdam, Acting P. J., and Fybel, J., concurred.