Filed 9/28/18

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| JAMES PAYTON,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>CSI ELECTRICAL CONTRACTORS, INC., et al.,<br><br>  Defendants and Respondents. | B284065<br><br>(Los Angeles County Super. Ct. No. BC525050) |

APPEAL from an order of the Superior Court of Los Angeles County. Ann I. Jones, Judge. Affirmed.

Peter R. Dion-Kindem; The Blanchard Law Group and Lonnie C. Blanchard, III for Plaintiff and Appellant.

Atkinson, Andelson, Loya, Ruud & Romo, Ronald W. Novotny and Jon M. Setoguchi for Defendant and Respondent CSI Electrical Contractors, Inc.

Pacific Employment Law, Maureen K. Bogue and Noah Levin for Defendant and Respondent First Solar, Inc.

_____

James Payton appeals from an order denying class certification. Payton filed this putative class action alleging wage and hour violations against Respondents CSI Electrical Contractors, Inc. (CSI) and First Solar, Inc. (First Solar) (collectively "Respondents"). The claims arose from construction work on a solar farm project in San Luis Obispo County.

Payton sought certification of two classes. The first, the Rest Period Class, concerned persons affected by Respondents' alleged practice of "tacking" the required 10-minute afternoon rest break onto the end of the 30-minute lunch break, resulting in a 40-minute mid-day break rather than a separate mid-afternoon break. The second, the Travel Pay Class, concerned persons who were not paid for time spent commuting in company-provided buses to the construction site, allegedly in violation of union contracts.

The trial court denied certification of both classes. With respect to the Rest Period Class, the trial court found that a class action was inappropriate and unworkable in light of the individual issues arising from evidence that particular working groups actually received regular afternoon breaks. With respect to both classes, the trial court found that Payton's trial plan was inadequate and that he was not a suitable class representative. The trial court based this finding on Payton's prior criminal convictions and the fact that he is also pursuing a personal wrongful discharge claim. The trial court denied Payton's request to look for a new class representative in light of the age of the case and the other problems with the motion for class certification.

We affirm. Substantial evidence supports the trial court's conclusion that individual questions would predominate in determining which class members actually have a claim for

missed rest breaks. The trial court also acted within its discretion in finding that Payton is not an adequate class representative, and in denying leave to substitute another representative in light of the age of the case and the futility of doing so.

**BACKGROUND**

### 1. Payton's Complaint

Payton was hired on May 22, 2012, by CSI as an electrical and construction worker to work on the Topaz Solar Farm. He claims he was "effectively terminated" less than a month later on June 14, 2012. First Solar was the "owner, operator and manager" of the Topaz Solar Farm, which is located in San Luis Obispo County.

Respondents provided buses that transported employees from employee parking lots to the jobsite. Travel time to the site could take up to an hour and a half. Payton claimed that Respondents were obligated under certain union contracts to pay travel time for employees who took these buses. Payton asserted class claims for the alleged failure to pay travel time, including claims for overtime compensation where warranted.

Payton also alleged that Respondents violated applicable regulations governing rest periods and meal breaks by tacking the second of the required two daily rest breaks onto the end of the mid-day meal period. Payton asserted class claims for this alleged violation on behalf of employees who worked shifts longer than six hours.

In addition to these class claims, Payton asserted an individual claim for wrongful termination in violation of public policy. Payton claimed that he suffered an injury on the job causing a "deep gash in his wrist." He alleged that the injury

3

"exposed a fault in the safety gear provided by Defendants" and that Respondents provided inadequate treatment.  He claimed that his employment was terminated after he complained about the lack of proper safety equipment and about Respondents' failure to provide him with adequate care for his injury.  He further claimed that Respondents falsely reported the reason for the termination as a " 'reduction of workforce.' "

## 2.    Payton's Motion for Class Certification

Payton filed a motion seeking certification of two classes. The Rest Period Class was allegedly composed of "All persons employed by CSI in the State of California as construction workers at the Topaz Solar Farm during the period from October 21, 2009 to the date . . . the class is certified who do not opt out and who worked a shift longer than six hours."  The Travel Pay Class allegedly consisted of "All persons employed by CSI in the State of California as construction workers at the Topaz Solar Farm during the period from October 21, 2009 to the date . . . the class is certified who do not opt out and who traveled to or from the work site using transportation provided [by] CSI or First Solar."

With respect to the Rest Period Class, Payton claimed that the tacked break policy violated paragraph 11 of Industrial Welfare Commission wage order No. 16-2001 (Wage Order 16). That paragraph states in relevant part that "Every employer shall authorize and permit all employees to take rest periods, which insofar as practicable, shall be in the middle of each work period.  Nothing in this provision shall prevent an employer from staggering rest periods to avoid interruption in the flow of work and to maintain continuous operations, or from scheduling rest periods to coincide with breaks in the flow of work that occur in the course of the workday.  The authorized rest period time shall

4

be based on the total hours worked daily at the rate of ten (10) minutes net rest time for every four (4) hours worked, or major fraction thereof." (Cal. Code Regs., tit. 8, § 11160, subd. 11(A).) Payton claimed that, under Labor Code section 226.7, Respondents "must pay one additional hour of compensation for each work day that the rest period is not provided."

With respect to the Travel Pay Class, Payton argued that Respondents were obligated to pay for travel time under several union agreements. The pertinent provision in those agreements stated that "[t]he Employer shall pay for traveling time and furnish transportation from shop to job, job to job, and job to shop. Travel time shall be at the appropriate rate of pay for that day of the week."

Payton supported the motion with his own declaration stating that he received only a "tacked" afternoon break on the job and was not paid for his travel time on the company buses. He also submitted excerpts from the deposition of CSI's corporate representative, Michael While, who testified in response to a question about " 'all of the meal break practices at the Topaz site.' " While stated that "[t]he employees would take a — a break at 9:30. Employees would take lunch at 12:00 o'clock. And then they would pick up at the end of the day to go home. [¶] Q Okay. Was a rest break provided in the afternoon similar to the 9:30 rest break? [¶] A It was tacked onto the lunch break, so the employees would take a 40-minute lunch. [¶] Q Okay. The practice of the Topaz site was that there would be a 30-minute lunch break, plus a simultaneous ten-minute rest break extending the whole period to 40 minutes, and there would be no separate rest break in the afternoon; correct? [¶] A Correct. On an eight hour day." While also testified that he communicated this practice to new employees at their orientation.

5

### 3.     Respondents' Opposition

Respondents denied that there was a policy at the Topaz construction site to deprive workers of an afternoon break. Respondents submitted declarations from numerous employees testifying that they always received afternoon breaks separate from the lunch break. The declarations included testimony by a union business manager that part of his job was to ensure that employees took their afternoon breaks.

Respondents also submitted a declaration from While explaining his deposition testimony. While explained that his testimony about the practice of tacked afternoon breaks "referred to scheduled, site-wide breaks." He said that he "did not understand counsel to be asking me about, and I did not testify regarding, afternoon breaks taken at the crew or individual level, rather than on a site-wide basis." He explained that, "[w]hile additional afternoon breaks were not scheduled on a site-wide basis, individual workers and crews were always permitted to take additional afternoon rest breaks, as needed, consistent with the work being performed on any given day." He personally observed crews taking afternoon breaks between 2:00 p.m. and 3:00 p.m.

With respect to Payton's alleged Travel Pay Class, Respondents denied that the travel pay provision on which Payton relied was applicable. They also argued that the claim for travel pay was preempted by federal law because it involved the alleged interpretation and breach of a collective bargaining agreement. In addition, they asserted that the claim was barred by the doctrine of judicial estoppel, because in opposing remand of the case following removal to federal court Payton represented that he did not seek relief under collective bargaining agreements.

## 4. The Trial Court's Ruling

The trial court denied Payton's motion on several grounds. First, with respect to the Rest Period Class, the court found that individual issues would predominate in determining which employees were not permitted to take afternoon rest breaks. The trial court credited Respondents' employee declarations and While's explanation of his deposition testimony and concluded that, based on that evidence, "trial would turn into an individual-by-individual exercise." The court also concluded that the question of the nature of the afternoon breaks the employees received—whether they were "recovery" breaks or regularly scheduled "rest breaks"—was "highly individualized." Moreover, in light of the provision in Wage Order 16 that rest breaks may be staggered "to avoid interruption in the flow of work," individual inquiry would be necessary to determine if tacked rest breaks were consistent with work performed by particular crews.

For the same reasons, the trial court also found that the Rest Period Class was not ascertainable, because individual issues would govern which class members actually had a claim for missed rest breaks.

With respect to the Travel Pay Class, the trial court denied Respondents' arguments that individual issues predominated. The court concluded that issues concerning Respondents' obligations, if any, under the union agreements, as well as those concerning Respondents' preemption and judicial estoppel defenses, "are all common issues capable of class-wide determination."

However, the trial court found that Payton was not a suitable class representative for either of the alleged classes. Payton previously served an eight-year prison sentence for "lewd and lascivious acts with a child under 14" and a three-month

7

sentence for felony marijuana sale. He also had a prior misdemeanor conviction from a parole violation for failing to register as a sex offender. Although the felony convictions were old (between 19 and 22 years old according to Payton), the trial court concluded that they raised a disqualifying credibility issue.

The trial court also found that Payton's claims were not typical of the class, as his individual wrongful discharge claim was likely to detract attention from the class wage and hour claims. The court declined Payton's request to look for a new class representative, concluding that permission to amend the complaint "in this almost 4-year-old case" would be futile given the other problems with the class certification motion.

Finally, the trial court found that Payton had not submitted an adequate trial plan for handling individual issues.

## DISCUSSION

### 1.     Legal Standards

A class action is permitted under Code of Civil Procedure section 382 when "the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court." Consistent with this provision, our Supreme Court has instructed that a party seeking certification of a class must "demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives." (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).) The "community of interest" requirement in turn includes three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class

8

representatives who can adequately represent the class. (*Ibid.*) The "ultimate question" in assessing predominance is "whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Duran v. U.S. Bank National Assn.* (2014) 59 Cal.4th 1, 28 (*Duran*).)

In addition to these requirements, a court considering a class certification motion must also "conclude that litigation of individual issues, including those arising from affirmative defenses, can be managed fairly and efficiently." (*Duran, supra,* 59 Cal.4th at pp. 28–29.) In the context of a wage and hour case "where a party seeks class certification based on allegations that the employer consistently imposed a uniform policy or de facto practice on class members, the party must still demonstrate that the illegal effects of this conduct can be proven efficiently and manageably within a class setting." (*Id.* at p. 29.)

An appellate court's review of a class certification order is "narrowly circumscribed." (*Brinker, supra,* 53 Cal.4th at p. 1022.) " 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification.' " (*Ibid.*, quoting *Fireside Bank v. Superior Court* (2007) 40 Cal.4th 1069, 1089 (*Fireside Bank*).) A trial court's ruling supported by substantial evidence will not generally be disturbed on appeal unless it was " 'based upon improper criteria or incorrect assumptions.' " (*Brinker*, at p. 1050.)

9

## 2. Individual Questions Predominate in Identifying the Persons Affected by the Alleged Rest Break Violation

Payton argues that Respondents' liability for the tacked rest break policy is a common issue that justifies certification of the Rest Period Class. The trial court rejected this argument, finding that individual issues would predominate because employees in particular working groups were permitted to take work breaks during the afternoon.

Substantial evidence supports the trial court's finding. Respondents submitted declarations attesting to regular afternoon breaks from workers in a number of different crews, including foremen in supervisory positions.

Importantly, Respondents also submitted evidence supporting the conclusion that mid-afternoon breaks were systematically enforced. As the trial court noted, "Mark Simonin, the business manager for IBEW Local 639, states, *inter alia*, that '[o]ver the course of the project, [he] personally observed and ensured that CSI's workers (and other IBEW workers) consistently took non-tacked afternoon rest breaks, separate and apart from their meal periods." Simonin testified that "[p]art of my job (and the job of the union stewards on the site) was to ensure that workers took their afternoon breaks." Another employee testified that an afternoon rest break was "CSI practice and required by the IBEW."

The trial court was entitled to credit such evidence. Based on that evidence, the trial court reasonably concluded that individual issues would predominate. Individual workers who were given regular, scheduled mid-afternoon breaks have no claim against Respondents, because Respondents did not deny them their rights under Wage Order 16. As the trial court

10

observed, separating those individuals from persons who received no mid-afternoon break would "turn into an individual-by-individual exercise."

Thus, Payton is incorrect in claiming that the existence of a site-wide tacked break policy itself was sufficient to prove liability on a common basis. Even assuming that a single tacked afternoon rest break was unlawful, the relevant question for liability is whether there was a uniform policy for workers to receive *only* such a break. Workers who received a mid-afternoon break either instead of, or in addition to, the tacked rest break did not suffer a violation under Payton's theory. Certainly Payton could not prove a violation by showing that Respondents permitted *more* rest periods than Wage Order 16 requires.

Permitting proof of class-wide liability based only on the existence of the site-wide tacked break policy would violate the fundamental principle that "the class action procedural device may not be used to abridge a party's substantive rights." (*Duran, supra,* 59 Cal.4th at p. 34.) As our Supreme Court explained in *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 462, "[c]lass actions are provided only as a means to enforce substantive law. Altering the substantive law to accommodate procedure would be to confuse the means with the ends—to sacrifice the goal for the going." The class action device may not be used here to provide relief to class members who actually suffered no violation because they were given the regular rest breaks that the law requires.

Payton argues that the trial court improperly ignored his *theory* of liability, which he describes as "a common contention[] that CSI violated California labor laws by failing to provide employees with the required afternoon rest periods that were required to be in the middle of the afternoon by tacking the

11

afternoon rest period onto the end of the noon meal period." (See *Brinker, supra,* 53 Cal.4th at p. 1033 ["[t]he theory of liability— that Brinker has a uniform policy, and that that policy, measured against wage order requirements, allegedly violates the law—is by its nature a common question eminently suited for class treatment"].) But a class plaintiff's theory of common proof must be more than wishful thinking; it must have a foundation in the evidence. As the court explained in *Cruz v. Sun World Internat., LLC* (2015) 243 Cal.App.4th 367, plaintiffs "may not simply allege" a uniform policy or practice, but must "present substantial evidence that proving both the existence of the defendant's uniform policy or practice and the alleged illegal effects of that policy or practice could be accomplished efficiently and manageably within a class setting." (*Id.* at p. 384.)

In *Brinker,* the court instructed that a court must examine the plaintiff's complaint "*and* supporting declarations" in determining whether the " 'theory of recovery advanced by the proponents of certification is, as an analytical matter, likely to prove amenable to class treatment.' " (*Id.* at p. 1021, italics added.) The court noted that the existence of a "common, uniform rest break policy" was conceded in that case. (*Id.* at p. 1033.) In contrast to this rest break class, the court reversed the trial court's certification of a subclass of employees who were allegedly required to work during meal periods because there was no evidence of any actual "systematic company policy to pressure or require employees to work off-the-clock." (*Id.* at p. 1051.)

Here, the trial court made findings contradicting Payton's theory that CSI implemented a uniform policy denying a mid-afternoon rest break. Because these findings were supported by substantial evidence, we will not reverse them.

12

Payton also argues that the evidence merely shows that some class members were able to take "ad hoc" afternoon breaks. Payton argues that this evidence therefore shows only a variation in individual damages. Payton cites the general rule that, " 'if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Brinker, supra,* 53 Cal.4th at p. 1022.)

This argument ignores the substantial employee testimony that afternoon breaks were not simply "ad hoc," but were regularly implemented as a matter of practice. As mentioned, that evidence included testimony from the union business manager—which the trial court credited—supporting the conclusion that the mid-afternoon rest break was consistently enforced.

Thus, the facts here are different than in cases that Payton cites where a common unlawful policy existed. In those cases, individual issues arose only because it was "necessary to determine whether individual employees were able to take breaks *despite* the defendant's allegedly unlawful policy (or unlawful lack of a policy)." (*Benton v. Telecom Network Specialists, Inc.* (2013) 220 Cal.App.4th 701, 726, italics added; see also *Faulkinbury v. Boyd & Associates, Inc.* (2013) 216 Cal.App.4th 220, 233 [evidence established that the employer had a "uniform policy of requiring all security guard employees to take paid, on-duty meal breaks"]; *Alberts v. Aurora Behavioral Health Care* (2015) 241 Cal.App.4th 388, 413 [evidence of a common de facto policy to deny breaks].)

In contrast, in this case the evidence supports the conclusion that individual questions would predominate in the proof of *liability*, not just damages. Even under Payton's theory, the site-wide tacked rest break policy was only unlawful if it was

13

the only break that employees were provided.  Respondents could not be liable to employees who were given the opportunity for regularly scheduled mid-afternoon breaks in compliance with the law.

The existence of *any* common policy is not sufficient to show that common issues predominate.  The policy in question must be a means to establish liability on a class-wide basis.  (See *Kizer v. Tristar Risk Management* (2017) 13 Cal.App.5th 830, 843 [even if defendant had an unlawful policy of misclassifying workers as exempt, no common theory of liability for withheld overtime pay existed in the absence of common proof that class members were actually required to work overtime].)

Thus, we affirm the trial court's ruling that individual issues predominate with respect to the Rest Break Class, and that the class therefore could not be certified.  We therefore need not consider the trial court's ruling that the Rest Break Class was overbroad and therefore not ascertainable.[1]

---

[1] In any event, the trial court's analysis on the issue of ascertainability was essentially the same as its analysis of predominance.  The trial court found that the class was overbroad because Payton "has not shown how he would identify employees who suffered rest period violations."  The court cited authority holding that, no matter how a class is actually defined, if it is overbroad because it includes those who do not have claims, and those persons can only be identified through individual inquiry, the class is not ascertainable.  (See, e.g., *Miller v. Bank of America, N.A.* (2013) 213 Cal.App.4th 1, 7.)

### 3. The Trial Court Acted Within Its Discretion in Rejecting Payton's Proposed Trial Plan

In *Duran, supra,* our Supreme Court explained that a trial court deciding whether to certify a class "must consider not just whether common questions exist, but also whether it will be feasible to try the case as a class action." (59 Cal.4th at p. 27.) The court cautioned that, "[i]n considering whether a class action is a superior device for resolving a controversy, the manageability of individual issues is just as important as the existence of common questions uniting the proposed class." (*Id.* at p. 29.) Consistent with the principle that the class action procedure may not be used to abrogate a defendant's substantive rights, "a class action trial management plan may not foreclose the litigation of relevant affirmative defenses, even when these defenses turn on individual questions." (*Id.* at p. 34.)

The trial court cited *Duran* in concluding that Payton's proposed trial plan was inadequate. That conclusion was within its discretion.

Payton's proposed trial plan was simply a general outline of a two-phased trial. The first phase would concern "[p]roof of the common policy or practices questions." Payton proposed that these issues would be determined by "the testimony of the Plaintiff" along with testimony of Respondent's "PMK's" (i.e., persons most knowledgeable) and various defense documents. Payton stated that he did not intend to call any experts unless the final trial plan or "the data produced by Defendants" called for them.

The proposed second phase of the trial would concern damages. Payton proposed a special master who would "make findings of fact for the members of the classes who participate in Phase Two." The findings would include the "number of second

15

rest periods to which each class member was entitled and the rest period premiums payable to each class member" and the "number of travel time hours each class member incurred when using the employer-provided transportation system and the amount of unpaid wages due each class member for such travel time."

Payton's proposed trial plan contained no discussion of any particular procedural device other than the idea of a two-phased trial and the use of a special master. As the trial court explained, the proposed plan did not contain any " 'explanation of the specific procedural tools to ensure his plan is valid and sufficiently rigorous.' " Nor did it contain any " 'basis for the factfinder to move from quantities of data to conclusions about liability to the class.' " Most critically, the proposed plan "fail[ed] to show how the individualized issues arising from Defendants' defenses can be managed."

With respect to the Rest Period Class, Payton's proposed plan provided no procedure to decide the individual issues concerning employees who in fact took regular, scheduled afternoon breaks. Payton argues that no such procedure was necessary because, once the unlawfulness of the tacking practice was established, each class member's damages could be calculated simply by multiplying each person's hourly rate by the number of shifts he or she worked. As discussed above, such an approach is impermissible because it would permit recovery by class members who do not actually have claims for missed rest breaks.

The proposed trial plan also failed to explain how the court could manage any individual issues concerning the Travel Pay Class. Although the trial court found that individual issues do not predominate with respect to that class, Payton did not

16

propose any specific procedure to adjudicate any individual defenses that nevertheless might arise.

Payton argues that, if he were successful in establishing the common issue of the *right* to travel pay for those who rode the company buses, company ridership logs would provide sufficient information about who was entitled to such pay and in what amounts. However, the logs that he cites are sign-in sheets for each bus trip containing employees' signatures. Many of those signatures are illegible. Some procedure would be necessary to decipher the signatures, count the bus rides that each employee took and their length, and compute the amount due based upon the individual employees' hourly pay, the length of each ride, and the number of hours the employee worked that day (for computation of any overtime). This procedure would also need to include a mechanism to resolve any factual disputes concerning the identity of particular persons who rode the company-provided buses if disagreements arose about interpretation of the signatures.

Payton did not identify any experts or even state any firm intention to employ experts. Indeed, he did not propose *any* procedure for determining individual class members' entitlement to travel pay as part of the judicial proceedings. He relied solely on the proposal for a special master. However, as the trial court correctly noted, "derogation of the Court's authority cannot be assumed." Appointment of a special master under section 638 requires agreement by the parties, as the " 'primary effect of such a reference is to require trial by a referee and not by a court or jury. [Citation].' " (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 255, quoting *Treo @ Kettner Homeowners Assn. v. Superior Court* (2008) 166 Cal.App.4th 1055, 1061.) Thus, Payton did not propose any means to resolve individual factual

disputes designed to protect Respondents' right to challenge Payton's proof.

**4.    The Trial Court Acted Within Its Discretion in Finding That Payton Is Not an Acceptable Class Representative**

The trial court found that Payton's claims were not typical of the class and that he was not an adequate class representative. The court based its findings primarily on: (1) Payton's individual wrongful discharge claim; (2) his prior criminal convictions; and (3) his failure to disclose one of those convictions on his apprenticeship application.[2] These findings were within the court's discretion.

Our Supreme Court has explained that whether a class representative is subject to unique defenses "is one factor to be considered in deciding the propriety of certification." (*Fireside Bank, supra,* 40 Cal.4th at p. 1090.) The danger that such defenses pose is that the representative might focus on his or her unique issues to the detriment of the issues common to the class, and that a major focus of the litigation will be on the unique issues. (*Ibid.*)

We agree with the trial court that the same concerns can apply to a class representative's unique *claims.* The relevant question is whether issues unique to the class representative will become a major focus at trial distracting from prosecution of the class claims.

---

[2] The trial court also found atypical Payton's allegation that he was jointly employed by CSI and First Solar. Because of our ruling affirming the trial court's findings of lack of typicality and inadequacy on other grounds, we need not reach this issue.

18

The trial court reasonably found that Payton's wrongful discharge claim posed that danger here. The court reasoned that the credibility battle over the real reason for Payton's termination would distract from the rest break and travel pay issues common to the class. The potential distraction was heightened by the credibility issues associated with Payton's failure to disclose his conviction for sale of marijuana on his union apprenticeship application.[3]

That failure to disclose, along with the criminal convictions themselves, also support the trial court's conclusion that Payton was not an adequate class representative. Credibility problems can be an appropriate ground to reject the adequacy of a class representative. (*Jaimez v. Daiohs USA, Inc.* (2010) 181 Cal.App.4th 1286, 1308 (*Jaimez*).) In *Jaimez,* the court concluded that the named plaintiff was not a suitable class representative because he failed to disclose prior criminal convictions on his employment application. (*Id.* at pp. 1293–1294, 1307–1308.) The evidence shows a similar failure to disclose here. Payton proffered an explanation for that failure, but the explanation could also have become the focus of a credibility battle.

---

[3] On his 2011 apprenticeship application, Payton disclosed prior convictions only for "lewd sex act" and "failure to register" in response to a question about prior felony convictions. In a supplemental declaration below, Payton stated that he did not list the marijuana conviction because he understood that the felony marijuana conviction "was supposed [to] be reduced to a misdemeanor after I served my sentence and completed my probation, and it did not occur to me that I needed to report it."

19

The convictions themselves could also seriously detract from Payton's credibility. Contrary to Payton's argument, his felony convictions, even though old, would be admissible for impeachment purposes at the discretion of the trial court. (Evid. Code, § 788.) His eight-year sentence for lewd and lascivious acts with a child under 14 is particularly serious, and, if permitted by the trial court, would likely have been a prominent feature in his cross-examination.

We therefore affirm the trial court's finding that Payton was not a suitable class representative.

5.     **The Trial Court Acted Within Its Discretion in Denying Leave to Search for Another Class Representative**

After concluding that Payton was not an adequate class representative, the trial court considered his request to substitute a new representative. The trial court concluded that, "given the other problems with the motion for class certification, allowing Plaintiff to locate a new class representative in this almost 4-year-old case would be futile." We conclude that, under the circumstances of this case, the trial court acted within its discretion in denying Payton's request to amend the complaint to add a new class representative.

As the trial court noted, the court in *Jones v. Farmers Ins. Exchange* (2013) 221 Cal.App.4th 986 (*Jones*) held that "[t]he lack of an adequate class representative . . . does not justify the denial of the class certification motion. Instead, the trial court must allow Plaintiff[] an opportunity to amend [his] complaint to name a suitable class representative. [Citation & fn. omitted.] The court should then grant the class certification motion if it approves a class representative." (*Id.* at p. 999.) However, along with the trial court, we do not understand this statement to be a

20

description of an absolute rule that a trial court *must* grant leave to amend to add a new class representative in every case in which a court concludes that the named plaintiff is inadequate.

In *Jones*, the court cited our Supreme Court's opinion in *La Sala v. American Sav. & Loan Assn.* (1971) 5 Cal.3d 864 (*La Sala*). That case concerned a situation in which the defendant in a putative class action attempted to disqualify the named plaintiffs by offering them individual relief that would make their claims atypical. The court rejected this tactic, concluding that the relief the named plaintiffs received did not render them "unfit per se to continue to represent the class." (*Id.* at p. 871.) The court left to the trial court's discretion on remand whether the named plaintiffs could continue to "fairly and adequately" protect the class. (*Ibid.*) The court also directed that, if the trial court concluded that the named plaintiffs were no longer suitable, "it should at least afford plaintiffs the opportunity to amend their complaint, to redefine the class, or to add new individual plaintiffs, or both, in order to establish a suitable representative." (*Id.* at p. 872.)

The court reached a similar conclusion in *Kagan v. Gibraltar Sav. & Loan Assn.* (1984) 35 Cal.3d 582, 593. The court held that a defendant was not permitted to "pick off" a class representative in an action under the Consumer Legal Remedies Act by providing individual relief to the named plaintiff. As in *La Sala,* the court left to the trial court to determine whether the plaintiff could continue to represent the class. (*Kagan,* 35 Cal.3d at p. 596.) And, as in *La Sala*, the court directed that, if the trial court found that the plaintiff was not a suitable class representative, it should provide an opportunity to amend to " 'establish a suitable representative.' " (*Kagan,* 35 Cal.3d at p. 596, quoting *La Sala, supra,* 5 Cal.3d at p. 872.)

21

Providing an opportunity to amend makes sense when a named plaintiff is disqualified as a result of a defense strategy to defeat a class action by offering individual relief. Without such an opportunity, defendants could manipulate the class action procedure to avoid class claims. (See *Larner v. Los Angeles Doctors Hospital Associates, LP* (2008) 168 Cal.App.4th 1291, 1299 [the rule permitting amendment to substitute a new class representative "prevents a prospective defendant from avoiding a class action by 'picking off' prospective class action plaintiffs one by one, settling each individual claim in an attempt to disqualify the named plaintiff as a class representative"].) That concern does not apply here. The trial court disqualified Payton because of his own background and conduct, not because of any defense manipulation.

An absolute rule requiring substitution of a new class representative after a ruling that the named plaintiff is inadequate would be inconsistent with the general principle that a trial court has discretion in deciding whether to permit an amended complaint. (See *Record v. Reason* (1999) 73 Cal.App.4th 472, 486 (*Record*) [trial court " 'has wide discretion in allowing the amendment of any pleading [citations], [and] as a matter of policy the ruling of the trial court in such matters will be upheld unless a manifest or gross abuse of discretion is shown' "], quoting *Bedolla v. Logan & Frazer* (1975) 52 Cal.App.3d 118, 135–136.)

The general principles governing the amendment of a complaint apply to the decision whether to permit an amendment naming a new class representative. In *California Gasoline Retailers v. Regal Petroleum Corp.* (1958) 50 Cal.2d 844 (*Gasoline Retailers*), the court reviewed the trial court's decision to substitute a new class representative under the procedure for amending a complaint under section 473. (*Id.* at p. 851.) The

22

court noted that, under that procedure, a trial court may permit an amendment "in its discretion" even after trial.  (*Ibid., citing Feigen v. Kutchor* (1951) 105 Cal.App.2d 744, 747–748.)  The court concluded that the amendment adding the new representative in that case did not prejudice the defendants, and that the trial court "did not abuse its discretion in permitting the amendment" to conform to proof.  (*Gasoline Retailers*, at p. 851;[4] see also *Jaimez, supra,* 181 Cal.App.4th at p. 1308 [applying rules governing the amendment of a complaint in ruling that the trial court abused its discretion in denying leave to substitute a new class representative]; *Safeco Ins. Co. of America v. Superior Court* (2009) 173 Cal.App.4th 814, 835 [leaving "to the sound discretion of the trial court" on remand whether to grant a motion to amend the complaint to substitute a new class representative].)

Leave to amend a complaint should be given liberally. (*Gasoline Retailers, supra,* 50 Cal.2d at p. 851; *Nestle v. City of Santa Monica* (1972) 6 Cal.3d 920, 938–939.)  However, there are circumstances in which leave to amend is properly denied.  In particular, denying a request to amend a complaint may be appropriate when an unreasonable delay in seeking amendment prejudices the defendant.  (*Ibid.; Record, supra,* 73 Cal.App.4th at pp. 486–487 [leave to amend properly denied where plaintiff was aware of the circumstances supporting the amendment when he filed his original complaint three years previously].)

---

[4] In *La Sala, supra,* the court cited *Gasoline Retailers* in holding that the plaintiffs should be permitted an opportunity to amend if the trial court found the named plaintiff unsuitable. (*La Sala, supra,* 5 Cal.3d at p. 872.)

Prejudice can include the time and expense associated with opposing a legal theory that a plaintiff belatedly seeks to change. For example, in *Melican v. Regents of University of California* (2007) 151 Cal.App.4th 168 (*Melican*), the court concluded that the trial court acted within its discretion in denying the plaintiff's oral request to amend the complaint during a summary judgment hearing. The plaintiff had known about the underlying facts for five years, and permitting the amendment at that point would have required the defendants to shoot at a "moving target" in their summary judgment motion. (*Id.* at p. 176.)

### a.    *Payton's Delay in Seeking to Amend*

One of the grounds that the trial court identified here for denying Payton's request to find a new class representative was the length of time this action has been pending. The trial court could properly rely on the age of the case in denying Payton's request to find a new class representative.

This action was originally filed in October 2013, nearly three years before Payton filed his motion for class certification. The record does not reflect when plaintiff's counsel learned of Payton's prior convictions. However, the convictions were part of the discovery record in this case at least by August 25, 2015, when Payton testified about them during his deposition. That was a year before Payton filed his motion for class certification on August 1, 2016. It was predictable that Payton's criminal convictions—along with his separate wrongful discharge claim— would be a point of contention in seeking class certification, and might disqualify Payton as a class representative. Yet Payton proceeded with his motion for class certification without any attempt to add or substitute a new class representative before filing.

24

Permitting Payton to amend now, after Respondents successfully opposed the original class certification motion, would require Respondents to shoot at a "moving target" in opposing certification. (See *Melican, supra,* 151 Cal.App.4th at p. 176.) The reasoning of the court in *In re Flash Memory Antitrust Litig.* (N.D. Cal. June 9, 2010) No. C 07-0086 SBA, 2010 U.S. Dist. LEXIS 59491, is helpful here.[5] In that case, the court denied a motion to amend the complaint to substitute new plaintiffs in a multi-state antitrust class action. (2010 U.S. Dist. LEXIS 59491 at \*\*69–70.) The plaintiffs filed the motion contemporaneously with their motion for class certification. (*Id.* at \*75.) The court concluded that the substitution would "unduly prejudice Defendants, who have been preparing their defense based on the identities of the class representatives identified in the pleadings. Allowing Plaintiffs to 'swap out' certain class representatives at this juncture would require Defendants to conduct new and/or additional discovery that would not otherwise have been required had Plaintiffs joined the appropriate representatives in the first instance." (*Id.* at \*74.) The court observed that the plaintiffs should have determined the qualifications of the class representatives "at the inception of the litigation, not years after the action had commenced." (*Id.* at \*75; see also *Giron v.*

---

[5] In the absence of California authority concerning class action issues, " 'California courts may look to the Federal Rules of Civil Procedure . . . and to the federal cases interpreting them [citation].' " (*Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 546, quoting Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 2007) ¶ 14:11.20, p. 14-9.)

*Hong Kong & Shanghai Bank Co.* (C.D. Cal. Nov. 15, 2017) No. 2:15-CV-08869-ODW(JC), 2017 U.S. Dist. LEXIS 189087, at *41 [denying plaintiffs' motion to substitute class representatives where, "despite adequate opportunity to identify and propose different class representatives, they chose to file their Motion to Certify Class, and only raised the possibility of different class representatives when substantively challenged regarding their typicality and adequacy"].)

Here, Payton should have sought to add or substitute a more suitable class representative before filing his motion for class certification.  The trial court did not abuse its discretion in denying Payton's request to amend the complaint made only after Respondents challenged his qualifications as a class representative in opposing the motion to certify the class.

**b.** *Futility of an Amendment*

In denying Payton's request to amend the complaint to substitute a new class representative, the trial court also cited "the other problems with the motion for class certification" that would make an amendment futile.  The futility of a proposed amendment can provide a ground to deny a request to amend. (*Sandler v. Sanchez* (2012) 206 Cal.App.4th 1431, 1437.)

The predominance of individual issues made any amendment futile with respect to the Rest Period Class.  The individual issues in proving injury were unrelated to the identity of the class representative, and could not have been cured by filing an amended complaint.

The trial court did not find the same predominance issues with respect to the Travel Pay Class.  However, the trial court did reject Payton's proposed trial plan, which concerned both alleged classes.  As discussed above, the trial court acted within its

26

discretion in doing so. An amended complaint also could not have cured the defective trial plan.

Nor was the trial court required to give Payton another opportunity to provide an acceptable trial plan. The problems with Payton's proposed plan for the Travel Pay Class did not suggest that an acceptable plan was *impossible* for that class; company records apparently do exist that might be used to identify who rode the company buses on what days. However, a plaintiff in a California class action ordinarily gets one shot at a class certification motion. (See *Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 811 ["no policy in the law allowed [the plaintiff] to 'renew' a class certification motion which had been denied on the merits by a final, appealable order"].) It would certainly be anomalous to require the trial court to provide a second chance to file an acceptable certification motion simply because a plaintiff created an *additional* problem by naming an unacceptable class representative.

## DISPOSITION

The trial court's order denying class certification is affirmed. Respondents are entitled to their costs on appeal.

CERTIFIED FOR PUBLICATION.


LUI, P. J.

We concur:



ASHMANN-GERST, J.          HOFFSTADT, J.


27