Filed 8/27/20  Brown v. City of Oakland CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| KEVIN BROWN,<br><br>　　　Plaintiff and Appellant,<br><br>v.<br><br>CITY OF OAKLAND,<br><br>　　　Defendant and Respondent. | A157706<br><br>(Alameda County<br>Super. Ct. No. RG17883799) |

After plaintiff and appellant Kevin Brown injured his knee at his job with respondent the City of Oakland (the City), he was placed on leave and eventually given permanent medical restrictions by his doctor.  The City conducted a six-month interactive process with Brown to attempt to return him to work, considering him for several vacant positions but ultimately finding none of them suitable.  The trial court granted summary judgment to the City on Brown's claims for failure to accommodate and failure to engage in the interactive process under the Fair Employment and Housing Act (FEHA) (Govt. Code, §§ 12940 et seq.)[1], and then denied his motion for leave to amend his complaint.  We affirm.

---

[1] Further undesignated statutory references are to the Government Code.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

### Brown's Injury and Medical Evaluations

In 2012, Brown was a Sewer Maintenance Leader employed by the City.

On June 6, 2012, Brown injured his left knee at work while climbing over a downed fence. He was placed on light duty until he had surgery on his knee that November. After the surgery, Brown returned to work on light duty, but his condition did not improve, and he had a second surgery performed in November of 2013. He was then placed on unpaid administrative leave.

In June of 2014, Brown was examined by Dr. Peter Mandell. After that examination, Dr. Mandell prepared a nine-page report in which he wrote that "Mr. Brown's condition is permanent, stationary, and ratable as of now." He also wrote: "Mr. Brown describes his job as heavy and physical. In all probability, he will not be able to return to that type of work. He is limited to sedentary work."

On August 20, the City wrote to Dr. Mandell, enclosing a description of the Sewer Maintenance Leader position and asking whether there was "any possibility" that Brown could return to work in that position. Dr. Mandell responded: "You ask whether there is ' . . . any possibility . . . ' that Mr. Brown can go back to the job described in the enclosure. My answer is there is a small possibility that he can do that. One can read this document to focus on the supervisorial aspect of the position. If Mr. Brown can do the paperwork of the job, the driving around of crews of the job, the supervising

---

[2] The factual background is drawn from Brown's response to the City's statement of undisputed material facts, the City's response to Brown's separate statement of undisputed material facts, and the various documents in the record, and is undisputed, except where noted.

of the crews (with the ability to stand or sit at will throughout the workday), the operation of closed circuit television cameras for inspection of sewer systems, and the use of such things as gas detectors with the approval of his employer, then he probably could do that kind of work.  As the parties can see from page 3 of my report, he should not do work which requires running, squatting, or kneeling.  He should not do work which requires walking around for more than about 20 minutes or so before he can sit down and rest for maybe 15 minutes and then get up and walk around again."

On August 26, Brown was seen by his primary treating physician, Dr. David Contreras.  Dr. Contreras wrote to the City that Brown was "complaining of ongoing bilateral knee pain and stiffness, which varies in intensity depending on his activity level."  He also wrote:  "I do agree with the evaluation by Dr. Peter Mandell with regard to apportionment and disability. I do feel that Kevin has reached the point of maximum medical improvement and would consider him permanent and stationary as of today 8/26/14."

**The Six-Month Interactive Process**

Brown contends that his case was essentially ignored over the next year.  He repeatedly contacted Worker's Compensation Manager Mary Costello, who eventually referred him to Disability Benefits Coordinator Annie Chin, for whom he left numerous voicemails.  Brown spoke with Disability Benefits Coordinator Mary Baptiste in March of 2015.

Annie Chin spoke with Brown on the phone on September 11, 2015, and the City sent him a letter notifying him that an interactive process meeting had been scheduled for September 25.  The meeting was rescheduled for October 19, and ended prematurely on that date.

A second interactive process meeting took place on December 11.  In attendance were Brown, his union representative, Chin, and other City

employees. According to a detailed ten-page written summary[3] of that meeting:

"Kevin indicated there was a lot on the Leader position that he cannot do. Reggie [another Sewer Maintenance Leader] described that the leader on the crew has to do all the same functions as the workers. Mr. Sommers [Brown's union representative] indicated since Mr. Brown can't squat, or kneel that makes sense to him that (since he believes that Mr. Brown will not be able to do the job) that we move past accommodation in the job of the Sewer Maintenance Leader to the alternate job search. Annie noted wanting Kevin to be comfortable with this dialogue plan prior to avoiding the accommodation discussion of the Sewer Maintenance Leader. Annie noted that Kevin had made similar requests during interactive calls with Annie in Sept. As Kevin began to express his seeming comfort with that plan, Dwight [another Sewer Maintenance Leader] asked to consider other options. [¶] . . . [¶]"

"Mr. Sommers asked if we could simply move forward to the alternate job search. Kevin indicated that he was comfortable with moving forward to the alternate job search because he was tired of discussing accommodation for the Sewer Maintenance Leader."

---

[3] On the second page, the summary provided: "The parties were verbally notified that this facilitator would take notes as the parties talked today. These notes would be printed immediately at the conclusion of the meeting and passed out. The parties will all stay at the meeting table and individually review their own copy of the drafted notes. Each person will be able to make any changes or additions that they feel are needed to correct, clarify or add to the discussion. Once all persons have shared all of their changes and additions to the notes, a final draft of the notes will be passed out and the parties will be asked to review the final draft and sign the document if it accurately represents the discussion that occurred and their individual statements."

"The following sections of the report which were originally intended for the accommodation discussion have remained to document the impact of Mr. Brown's accommodations on the essential job functions of the Sewer Maintenance Leader. As noted above, Mr. Brown and Mr. Sommers both requested we not discuss them in great detail since they believed already that Kevin is medically precluded from some essential job functions of the Sewer Maintenance Leader position. [¶] . . . [¶]"

"The parties discussed modified work and it was agreed that based on the work restrictions, Mr. Brown could not be accommodated back into his position as a(n) Sewer Maintenance Leader as the physical demands of the job could not be minimized with accommodations and that he would need to perform the activities restricted."

A six-month search for an alternative position officially began in December 2015. Each week, Brown was sent by email and mail listings of all job openings with the City.

Brown expressed interest during the alternative job search in several available positions, including Public Works Maintenance Worker, Street Maintenance Leader, a Yard Work Support assignment, and Street Sweeper Operator.

**Public Works Maintenance Worker and Street Maintenance Leader**

The first position in which Brown expressed interest was that of Public Works Maintenance Worker, a position that "performs a variety of maintenance duties in street and traffic maintenance and construction, sanitation and weed abatement."

The "Essential Function Job Analysis" for the position indicates that it encompasses four assignments, and that "all assignments are considered essential and requirements of the position": "Vegetation Management,"

where an employee "[c]uts and removes vegetation over-growth within Oakland, including maintaining pedestrian pathways, City owned lots, medians, roadsides and other related sites," "Removal of Illegal Dumping," where an employee "[r]emoves illegally dumped items within the City of Oakland, including appliances, water heaters, refrigerators, furniture, sand, concrete rubble, shopping carts, household garbage and other related items. Depending on the object, the employee loads items with the assistance of a co-worker or mechanical assistance," "Maintenance of Litter Containers," in which an employee "[m]aintains litter containers located throughout the City of Oakland, including using a variety of basic tools to repair doors, hinges and other related parts; this activity is performed approximately 50% of the time, the remainder is spent removing illegally dumped objects/garbage," and "Downtown Crew/Roving," which "[c]leans Downtown Oakland, including sidewalks, plazas and other related areas, installs litter containers, and services transit hubs within the city."

According to the declaration of Frank Foster, an Operations Manager for the City, the job duties of a Public Works Maintenance Worker "generally consist of heavy manual labor on a daily basis, including frequent bending, squatting, stooping, walking, standing, and climbing. Lifting and carrying heavy items is very frequent. It is very physical work. This is true of all Workers in the illegal dumping, graffiti abatement and vegetation management, and special events sections."

Street Maintenance Leaders are Public Works Maintenance Workers who "act in a lead capacity over field crews." Again, according to Foster: "The duties and tasks of a Street Maintenance Leader include all the tasks and duties of a Public Works Maintenance Worker described above. In addition, a Street Maintenance Leader must manage and supervise the crew

6

he is working with on that day. Street Maintenance Leaders also drive the trucks that their crews travel in to and from the work site, and are required to maintain a Class B license as a condition for the job. The Leader acts as an on-site foreman of his crew, but performs all of the same physical tasks that a Public Works Maintenance Worker performs, including frequent bending, squatting, stooping, walking, standing, climbing, and carrying heavy items, all on a daily basis."

### Yard Work Support Assignment

Brown also expressed interest in a Yard Work Support assignment. According to the declaration of Johnny Nicks, a supervisor in the Sewers Division: "The people in this assignment manage the inventory of tools, equipment and supplies used by Sewers employees, at the yard. This assignment is generally performed by experienced Sewer Maintenance Leaders, and occasionally by Sewer Maintenance Workers. This assignment is also very physical, requiring lifting and moving pipes, bags of asphalt, large hoses, sheets of plywood, tools, and other equipment. The employees in this assignment are required to take tools and supplies to locations throughout the City where work is being performed and unload those tools and supplies from trucks, and reload items back onto trucks. The assignment requires significant amounts of standing and walking, climbing in and out of trucks, and bending and squatting to lift items, all on a daily basis.

"The 'Yard Dog' assignment has never been a position. It is an assignment that is filled by Sewer Maintenance Leaders and Workers.

"Every Sewer Maintenance Leader or Worker who performs the 'Yard Dog' assignment must be able to perform all the duties of his position. Employees in the 'Yard Dog' assignment are called out on emergencies. This typically happens at least once a month, and usually several times a month.

7

When called out on an emergency, that Leader or Worker is required to perform the usual duties described in paragraph 4 [describing the duties of Sewer Maintenance Leader] above. If the employee in the 'Yard Dog' assignment is a Sewer Maintenance Leader, that employee must have a valid Class B license, and meet all the other requirements of the Leader position. If an employee is physically unable to perform all the duties of his position as a Sewer Maintenance Leader, that employee cannot and would not be permitted to perform the 'Yard Dog' assignment."

**Street Sweeper Operator**

Brown also expressed interest in a Street Sweeper Operator position. According to the "Class Specification" for the position, the duties include "[o]perat[ing] street sweepers exceeding 26,000 lbs. gross vehicle weight rating and related equipment to sweep streets and gutters on assigned routes; sweep parking lots, courtyards and freeway underpasses," and "[t]ransport trash to dumps; clear debris from right-of-way; clean storm drains and inlets." Qualifications include the ability to "[p]erform manual labor." According to the "Work Task Analysis" for the position, employees have to lift and carry "a 35 lb. bucket of Absorb-All for hydraulic fluid" and various weights of debris from roadways.

According to the declaration of Frank Foster, "[a]n Operator must be able to climb up and down several steps to enter and exit the vehicle multiple times during a shift. Operators must also bend or squat to lift and carry heavy buckets of cleaning fluids and to carry and use tools for cleaning on a daily basis." The position of Street Sweeper Operator also requires a Class B license.

**Office Assistant II**

Somewhere along the way, Annie Chin proposed that Brown apply for an Office Assistant II position, a proposal he considered a "slap in the face." He did not apply for the position.

**End of the Interactive Process, Equipment Parts Technician Position, and Brown's Rehiring**

The six-month alternative job search ended on June 13, 2016. Brown was given notice of the City's intent to medically separate him from employment on September 22, 2016, a decision that Brown and his union appealed.

On October 13, the day after the appeal hearing, Brown expressed interest in the position of Equipment Parts Technician position.

According to Joseph Williams, Interim Equipment Services Manager for the City: "The duties of an Equipment Parts Technician focus on management of inventory for the automobiles and heavy equipment utilized by the Department of Public Works, as well as for the City's fire suppression vehicles. The position involves constant standing and walking, and frequent lifting of heavy items in excess of 50 pounds. Some of the work is performed by operating a forklift, which requires stepping in and out of the lift multiple times per day. Occasionally the Technician must climb small ladders, push and pull carts, and squat and crouch when lifting items or to locate parts kept closer to the ground. The Department's fleet of vehicles and heavy machinery is large and lifting, walking, and standing are constant during the workday."

The job description gives as examples of duties "Operate a forklift and other storeroom equipment" and "Lift heavy materials and supplies." It requires the ability to "Lift and move heavy items, up to 50 lbs. in a safe manner," "Perform heavy manual work in lifting and moving stock," and

9

"Operate a forklift and related material handling equipment." Essential functions include stooping, kneeling, crouching, climbing, and reaching.

The City sent a supplemental questionnaire to Dr. Contreras regarding the position. In a chart note dated October 24, Dr. Contreras wrote: "I have reviewed the requirements for the equipment parts technician. I feel that for the most part Kevin will be able to perform these duties. He will require permanent restrictions, which previously have been outlined which include no running, no squatting, limited kneeling and limited walking." Dr. Contreras also filled out the questionnaire from the City, finding that Brown could kneel for one minute before requiring a break from kneeling for 10 minutes, for a total of 6 minutes per hour and 20 minutes per day. He also found that Brown could walk or stand for 20 minutes at a time before requiring a break for 15 minutes, and that he could walk or stand for 40 minutes per hour and 300 minutes per day. The City subsequently told Brown that he could not qualify for the Equipment Parts Technician role.

Brown's medical separation was eventually upheld on appeal, and he was separated from employment effective December 28.

On June 1, 2017, a meeting was held in order to restart Brown's interactive process and explore returning him to work. Later that month, Dr. Contreras completed another questionnaire regarding Brown's permanent work restrictions. Now, Dr. Contreras found that instead of no squatting, Brown could squat for 30 minutes per hour; had no restriction on kneeling; and could stand or walk for a total of 45 minutes per hour.

On July 13, Dr. Contreras wrote that Brown "is able to return to work 7.13.17 without restriction." At another interactive process meeting held the next day, the City agreed to rehire Brown as a Sewer Maintenance Worker effective July 31. Brown's Class B license, a requirement for his former

10

position of Sewer Maintenance Leader, had expired, and thus he was not minimally qualified for that position.

**This Action**

On November 17, 2017, Brown filed the complaint in this action asserting four causes of action under the FEHA: (1) disability discrimination; (2) failure to engage in the interactive process; (3) failure to accommodate; and (4) retaliation.

On February 4, 2019, Brown dismissed the disability discrimination and retaliation causes of action without prejudice.

On February 15, the City moved for summary judgment, or alternatively summary adjudication, on Brown's remaining claims. Brown filed opposition on April 9, and the motion was set for hearing on April 23.

On April 22, Brown sought leave to file a first amended complaint, to assert a new cause of action for disability discrimination under section 12940, subdivision (a), alleging that the City "refused to engage in a good faith interactive process and accommodate Plaintiff because of its 100 healed [*sic*] policy." Brown asserted that he had discovered the alleged 100-percent healed policy "less than 2 months ago," including in depositions that took place on February 28 and March 8.

Brown's proposed first amended complaint also sought to add language indicating he was "regarded and treated as being disabled" by the City to the allegation that he had a qualifying disability in his two existing causes of action, because the City had for the first time in its motion for summary judgment "raise[d] the defense that Plaintiff was not disabled."

On May 14, the trial court granted the City's motion for summary judgment, finding that there was no issue of material fact as to whether there were vacant positions with the City that Brown could perform with or

11

without accommodation, and that Brown's failure to engage claim failed because he did not identify any reasonable accommodation that the City could have provided.

Two days later, the trial court heard Brown's motion for leave to amend the complaint. On May 24, the court denied the motion, finding that reinserting a claim for disability discrimination would prejudice the City because discovery had already closed and the deadline for dispositive motions had passed.

Judgment in favor of the City was entered on May 29. Brown appeals both the judgment and the order denying him leave to amend.

## DISCUSSION

Brown raises three arguments: (1) there was a triable issue of fact as to whether there were vacancies available that he could perform with or without accommodation; (2) his failure to engage claim did not require him to identify a reasonable accommodation that the City should have provided; and (3) he should have been granted leave to amend his complaint.

### Applicable Law and the Trial Court's Ruling

The FEHA makes it unlawful "[f]or an employer . . . to fail to make [a] reasonable accommodation for the known physical or mental disability of an . . . employee," unless the employer demonstrates such accommodation would cause an "undue hardship." (§ 12940, subd. (m)(1).) "There are three elements to a failure to accommodate action: '(1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability. [Citation.]'" (*Hernandez v. Rancho Santiago Cmty. Coll. Dist.* (2018) 22 Cal.App.5th 1187, 1193–1194.) The employee has the burden of proof to show that a reasonable

accommodation could have been made. (*Nadaf–Rahrov v. Neiman Marcus Group, Inc.* (2008) 166 Cal.App.4th 952, 976–978 (*Nadaf–Rahrov*).)

"[A]ssuming the employee is disabled, the employer cannot prevail on summary judgment on a claim of failure to reasonably accommodate unless it establishes through undisputed facts that (1) reasonable accommodation was offered and refused; [or] (2) there simply was no vacant position within the employer's organization for which the disabled employee was qualified and which the disabled employee was capable of performing with or without accommodation; or (3) the employer did everything in its power to find a reasonable accommodation, but the informal interactive process broke down because the employee failed to engage in discussions in good faith." (*Jensen v. Wells Fargo Bank* (2000) 85 Cal.App.4th 245, 263 (*Jensen*).)

With respect to Brown's failure to accommodate claim, the trial court concluded:

"At oral argument, Defendant focused its discussion on *Jensen*'s second prong, arguing there was no evidence in the record of any position Plaintiff was qualified for that he could have performed, with or without accommodation.

"There is some evidence, presented by Defendant, that this is, in fact, not entirely true. Defendant did ask Plaintiff to consider working as an Office Assistant II and Defendant also sent Plaintiff lists of open positions weekly for several months. (Def.'s Sep. St., UMF 16, 18.) However, Plaintiff refused the Office Assistant II position, and, at oral argument, Plaintiff's counsel confirmed that Plaintiff did not consider the Office Assistant II position to be a reasonable accommodation. Since neither party considers the Office Assistant II position relevant to the Court's analysis here, the Court disregards it. As for the weekly job lists, it is not possible to know whether

13

Plaintiff was qualified for or capable of performing any of those jobs without individualized analyses of each of those positions. However, individualized analyses of each position were not performed for every position, but for those positions that were individually analyzed, for each of them, Defendant has presented credible evidence that Plaintiff's physical limitations, confirmed by Plaintiff's doctors, prevented him from performing those jobs with or without accommodation. (Def.'s Sep. St., UMF 6, 7, 9, 17, 19–21, 24–26.)

"To rebut this, Plaintiff has presented his own deposition testimony, which contradicts the directives of his doctors. (See Pltf.'s Sep. St., AUMF 26, 27; but see Def.'s Sep. St., UMF 15 [stating that at an interactive process meeting Plaintiff agreed he could not perform the essential functions of his job].) Despite this contradictory testimony from Plaintiff, Defendant is and was permitted to rely on the medical reports from Plaintiff's doctors. (See *Hanson v. Lucky Stores, Inc.* (1999) 74 Cal.App.4th 215, 227–229.) Plaintiff also submitted video footage of Defendant's workers performing daily duties, (see Pltf.'s Sep. St., AUMF 60–64), but the limited time period covered by the video does not allow it to be probative of the duties those workers would actually perform on a periodic basis, and it does not speak to whether vacant positions existed that Plaintiff could physically perform.

"Accordingly, no material facts exist that vacant positions existed for which Plaintiff could perform. The only substantial evidence presented on the issue tends to indicate Plaintiff could not perform any vacant position that Defendant had available during the applicable time period. Accordingly, Plaintiff's cause of action for failure to accommodate cannot survive the second prong of *Jensen*. As such, no triable issue of material fact exists in regards to the cause of action and the cause of action fails."

**Standard of Review**

A court shall grant a motion for summary judgment "if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (Code Civ. Proc., § 437c, subd. (c).) As the party moving for summary judgment, the employer in a FEHA action has the burden of establishing either (1) one or more elements of the employee's cause of action cannot be established, or (2) a complete affirmative defense to the cause of action exists. (Code Civ. Proc., § 437c, subds. (o )(1), (2), (p)(2).) To demonstrate the elements of a cause of action cannot be established, the employer may show the employee does not possess evidence needed to support a prima facie case and also cannot reasonably obtain the needed evidence. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 854.) The employer may also, but need not, present evidence conclusively negating an element of the cause of action. (*Ibid*.) Once the employer has met its initial burden, the burden shifts to the employee to produce evidence showing a triable issue of material fact. (Code Civ. Proc., § 437c, subd. (p)(2).)

"On appeal from summary judgment, we review the record de novo and must independently determine whether triable issues of material fact exist. (*Saelzler v. Advanced Group 400* (2001) 25 Cal.4th 763, 767; *Guz v. Bechtel National, Inc.* (2000) 24 Cal.4th 317, 334.) We resolve any evidentiary doubts or ambiguities in favor of the party opposing summary judgment. (*Saelzler v. Advanced Group 400, supra*, at p. 768.)" (*Nealy v. City of Santa Monica* (2015) 234 Cal.App.4th 359, 370–371 (*Nealy*).)

"On review of a summary judgment, the appellant has the burden of showing error, even if he did not bear the burden in the trial court." (*Claudio v. Regents of the University of California* (2005) 134 Cal.App.4th

224, 230 (*Claudio*).) " '[D]e novo review does not obligate us to cull the record for the benefit of the appellant in order to attempt to uncover the requisite triable issues. As with an appeal from any judgment, it is the appellant's responsibility to affirmatively demonstrate error and, therefore, to point out the triable issues the appellant claims are present by citation to the record and any supporting authority. In other words, review is limited to issues which have been adequately raised and briefed.' " (*Ibid*., quoting *Lewis v. County of Sacramento* (2001) 93 Cal.App.4th 107, 116.)

### Brown Has Failed to Identify a Triable Issue of Fact as to Whether There Were Vacant Positions He Could Perform

Brown makes two arguments why summary judgment should not have been granted to the City on his failure to accommodate claim: (1) the City maintains a "100-percent healed" policy which is a per se violation of section 12940, subdivision (m); and (2) the trial court erred by considering only the positions analyzed by the City, "excluded" evidence that Brown could have performed certain available positions, and should not have deferred to the opinions of Brown's doctors.

### The City Did Not Apply a 100-percent Healed Policy to Brown

Brown argues that the City maintained a "100% healed policy," requiring employees to be 100 percent healed before returning to work, in violation of the FEHA. (See *Gelfo v. Lockheed Martin Corp.* (2006) 140 Cal.App.4th 34, 49, fn. 11 (*Gelfo*) [suggesting such a policy is a per se FEHA violation].) In support of this allegation, he cites certain deposition testimony of Johnny Nicks, a supervisor in the Sewers Division, regarding other workers in his division who were placed on light duty because of temporary injuries, and regarding Brown's duties in the division after he returned to work in 2017. Nicks testified, for example, that "you need to be at 100 percent to come back because of the strenuous work that you're doing

16

out there," that "I'm pretty sure it's City policy to come back at 100 percent," and that he made "mention to [Brown] that being back in the sewer department you know, you need to be back at full capacity at 100 percent. I let him know that a couple of different times [after he returned to work in 2017]."

But whatever Nicks' understanding of the City's policy was, it was irrelevant. Nicks was not involved in Brown's interactive process, and although the full context of his statements is not always clear, certain of them appear to concern Brown's return to work—without medical restrictions—once that process was long since completed. Mary Baptiste, a Disability Benefits Coordinator for the City, testified that the interactive process began after the employee's restrictions became permanent. And most importantly, it was undisputed that the City engaged in a six-month interactive job process with Brown, sent him listings of available vacancies, and considered him for several vacant positions. Brown may dispute the adequacy of this process, but it is undisputed that it took place.

### Brown's Other Arguments Challenge the Trial Court's Rationale, Not Its Ruling

Brown's second argument focuses on the following passage from the trial court's written ruling:

"As for the weekly job lists, it is not possible to know whether Plaintiff was qualified for or capable of performing any of those jobs without individualized analyses of each of those positions. However, individualized analyses of each position were not performed for every position, but for those positions that were individually analyzed, for each of them, Defendant has presented credible evidence that Plaintiff's physical limitations, confirmed by Plaintiff's doctors, prevented him from performing those jobs with or without accommodation."

17

Brown asserts this manifests three errors: (1) the court erred by "limiting its 'no vacancy' analysis to those vacancies the City alone chose to consider," (2) the court did not explain what positions it considered nor the evidence that it found supported the City's position, and (3) the court erred in "deferring" to the opinion of Brown's doctors despite his contradictory testimony, the last argument relying on *Gelfo*, *supra*, 140 Cal.App.4th at p. 49, fn. 11: " '[A]n employer cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.' "

These arguments fail, primarily because on appeal from summary judgment, we review "the [trial] court's ruling, not its rationale. *Kids' Universe v. In2Labs* (2002) 95 Cal.App.4th 870, 878." (*Prop. California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1161.)

The first argument also appears to misread the trial court's opinion—not to mention the record on summary judgment. The trial court did not explain which positions it was referring to, but the City's statement of undisputed material facts discusses several positions in detail, each time—with the exception of the Office Assistant II position—indicating that the City analyzed them because Brown himself "expressed interest" in them during the interactive process. The trial court did not, as Brown suggests, "allow[] the City to cherry-pick which jobs to analyze."

Brown's second argument asserts that the ruling "omits essential considerations," and fails to explain what positions the City considered or what "credible evidence" the trial court found supported the City's argument. Again, these arguments fail as challenges to the trial court's rationale.

Brown also asserts that "the record is replete with evidence challenging the sufficiency of the City's accommodation efforts," going on to make

18

scattershot reference to numerous paragraphs of the City's separate statement of material facts and his response. To take one example, Brown points to a dispute about whether Brown admitted that he could not perform the essential functions of a Sewer Maintenance Leader, or simply agreed to move on to a search for alternative positions because "he was tired" of the process. But what does this have to do with whether Brown could, in fact, perform those essential functions, with or without accommodation? Similarly, Brown alleges that the City initially determined that he met the minimum qualifications for the Equipment Parts Technician position, only to later change its position. But he does not actually describe or discuss the essential functions of the position, nor does he explain why there was a triable issue of fact as to whether he could perform them. In short, Brown has not carried his burden to "affirmatively demonstrate error." (*Claudio*, *supra*, 134 Cal.App.4th at p. 230.)

Finally, to the extent Brown argues that the trial court deferred to the medical records—that the City "slavishly deferred" to his doctor's opinion—we disagree. *Gelfo*, *supra*, 140 Cal.App.4th 34 is distinguishable. There,"[t]he reports on which [the employer] premised its refusal to hire were based, not on an individualized assessment or testing, but on the workers' compensation doctors' cursory, generalized opinions about prophylactic measures aimed at avoiding potential injuries to someone with a back injury like Gelfo's, which might occur by one performing the functions of fabricator." (*Id*. at p. 49, fn. 11.)

Here, by contrast, Dr. Mandell's evaluation was based on individualized assessment and testing—indeed, an evaluation with which Brown's treating physician agreed. Perhaps even more to the point, at the time of Brown's interactive process, he apparently did not even dispute that

19

he was restricted from squatting or kneeling and he certainly has not identified any facts or evidence before the City at that time calling into question the "objective reasonableness" of Dr. Mandell's restrictions. (*Gelfo*, *supra*, 140 Cal.App.4th at p. 49, fn. 11.) Moreover, according to the notes of the initial interactive process meeting, both Brown and his union representative "requested we not discuss [the essential functions of the Sewer Maintenance Leader position] in great detail since they believed already that Kevin is medically precluded from some essential job functions of the Sewer Maintenance Leader position." In short, there is nothing in the record to indicate that the City "slavishly deferred" to Dr. Mandell's restrictions despite their being objectively unreasonable. Brown has failed to demonstrate that the trial court erred in granting summary judgment to the City on his failure to accommodate claim.

### Brown's Failure to Engage in the Interactive Process Claim Fails Because He Has Not Identified Any Accommodation the City Should Have Provided

The FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).)

The trial court concluded that Brown's failure to engage in the interactive process claim under section 12940, subdivision (n) failed because he never identified any reasonable accommodation the City should have provided, relying on *Nadaf–Rahrov*, *supra*, 166 Cal.App.4th at p. 984 and *Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1015–1019 (*Scotch*). We agree.

20

Brown argues at length that he need not identify a reasonable accommodation in order to prevail on his interactive process claim, relying on the statutory text, the legislative history, and the legislative purpose. However, he acknowledges that in *Nadaf–Rahrov*, Division Five of this court conducted a lengthy and thoughtful analysis of the statute and its purpose, concluding that "the availability of a reasonable accommodation (i.e., a modification or adjustment to the workplace that enables an employee to perform the essential functions of the position held or desired) is necessary to a section 12940[, subdivision] (n) claim" and that "the burden of proving the availability of a reasonable accommodation rests on the employee." (*Nadaf–Rahrov, supra*, 166 Cal.App.4th at p. 984.) And at least one other case has analyzed the issue and likewise concluded that the employee must identify a reasonable accommodation to prevail on an interactive process claim: *Scotch, supra*, 173 Cal.App.4th at pp. 1015–1019. (See also *Nealy, supra*, 234 Cal.App.4th at pp. 379–380 [rejecting interactive process claim based on *Nadaf–Rahrov* and *Scotch*].)

Brown claims that there is a split of authority on this question, a claim based on two cases, the first of which is *Claudio, supra*, 134 Cal.App.4th at p. 242. There, after the plaintiff became disabled, the defendant employer "checked plaintiff's resume against available positions at the University, concluded none was available that matched plaintiff's job skills, and effected plaintiff's termination from employment." (*Id*. at p. 228.) Claudio claimed he had been terminated in violation of the public policy in the FEHA, a claim that the parties treated as an interactive process claim under section 12940, subdivision (n). (*Id*. at pp. 230, 243.) The Court of Appeal reversed the trial court's grant of summary judgment, holding that "since we conclude a triable issue exists concerning failure by the [employer] to participate in the

21

interactive process, the judgment cannot be affirmed on the ground that no alternate jobs were available." (*Id*. at p. 248.) Because the employer completely failed to participate in the interactive process, "it cannot be known whether an alternate job would have been found." (*Id*. at p. 245.) The Court of Appeal continued:

"The [employer] assert[s] plaintiff was totally disabled and therefore the only accommodation that could have been at issue, if plaintiff had participated in the interactive process, was an unlimited extension of his leave of absence. However, as is apparent from our recitation of the record, it is not at all clear that this is true. At a minimum, it appears plaintiff may have been physically able to handle clerical positions. Thus, this is not a case (at least not yet) where it can be said an interactive process would have been futile. (Cf. *Swonke v. Sprint, Inc.* (2004) 327 F.Supp.2d 1128, 1137 [interactive process would have been futile because plaintiff was totally disabled from any employment].)" (*Claudio*, *supra*, 134 Cal.App.4th at p. 249.) That is not the situation here.

The other case on which Brown relies is *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.App.4th 413 (*Wysinger*). There, the jury found for the employer on a claim for failure to accommodate under section 12940, subdivision (m), but against the employer on a claim for failure to engage in the interactive process under section 12940, subdivision (n). (*Wysinger*, *supra*, 157 Cal.App.4th at p. 424.) *Wysinger* rejected the employer's argument that the resulting verdict was internally inconsistent, holding as follows:

"Here the verdicts on the reasonable accommodation issue and the interactive process claim are not inconsistent. They involve separate causes of action and proof of different facts. Under FEHA, an employer must engage

22

in a good faith interactive process with the disabled employee to explore the alternatives to accommodate the disability. (Gov. Code, § 12940, subd. (n); *Claudio*[, *supra*,] 134 Cal.App.4th [at p.] 242 [employer may not fail to engage in a timely, good faith interactive process to determine effective reasonable accommodations].) 'An employee may file a civil action based on the employer's failure to engage in the interactive process.' (*Claudio*, *supra*, at p. 243.) Failure to engage in this process is a separate FEHA violation independent from an employer's failure to provide a reasonable disability accommodation, which is also a FEHA violation. (Gov. Code, § 12940, subd. (m); *Gelfo*[, *supra*,] 140 Cal.App.4th [at p.] 61; *Claudio*, *supra*, at p. 242 [employer may not fail to make a reasonable accommodation].) An employer may claim there was no available reasonable accommodation. But if it did not engage in a good faith interactive process, 'it cannot be known whether an alternative job would have been found.' (*Claudio*, *supra*, at p. 245.) The interactive process determines which accommodation is required. (*Ibid.*; *Jensen*[, *supra*,] 85 Cal.App.4th [at p.] 263, fn. 7.) Indeed, the interactive process could reveal solutions that neither party envisioned.

"Here the jury could find there was no failure to provide a required accommodation because the parties never reached the stage of deciding which accommodation was required. ACSC prevented this from happening by its refusal to engage in the interactive process." (*Wysinger*, *supra*, at pp. 424–425.)

Brown argues there is a split of authority between *Claudio* and *Wysinger* on one hand and *Nadaf-Rahrov* and *Scotch* on the other, but this is somewhat of an overstatement. As noted, *Claudio's* facts are distinguishable, and *Wysinger* considered whether a jury verdict was inconsistent, not the issue squarely analyzed and addressed in *Nadaf-Rahrov* and *Scotch*:

23

whether a plaintiff must identify a reasonable accommodation to defeat summary judgment on a claim of failure to engage in the interactive process. And we are unable to find any California cases citing *Wysinger* or *Claudio* for the proposition that the plaintiff need not do so.

The Court of Appeal in *Scotch* reconciled *Nadaf-Rahrov*, *Claudio*, and *Wysinger* in a lengthy explanation, an explanation with which we agree:

"*Wysinger*, *Nadaf–Rahrov*, and *Claudio* are not entirely inconsistent and can be reconciled. All three cases recognize the employee does not have the same access to information as the employer and therefore the interactive process is important in determining what accommodations are available. The *Nadaf–Rahrov* court pointed out that *Wysinger* did not explain the appropriate remedy for failure to engage in the interactive process 'in the absence of a failure to accommodate' under section 12940, subdivision (m). (*Nadaf–Rahrov*, *supra*, 166 Cal.App.4th at p. 983, fn. 13.) The *Wysinger* panel did not have to explain the remedy because it was reviewing a jury verdict finding the employer liable for retaliation against the employee for filing an age discrimination claim. (*Nadaf–Rahrov*, *supra*, at p. 983, fn. 13.)

"We synthesize *Wysinger*, *Nadaf–Rahrov*, and *Claudio* with our analysis of the law as follows: To prevail on a claim under section 12940, subdivision (n) for failure to engage in the interactive process, an employee must identify a reasonable accommodation that would have been available at the time the interactive process should have occurred. An employee cannot necessarily be expected to identify and request all possible accommodations during the interactive process itself because ' " '[e]mployees do not have at their disposal the extensive information concerning possible alternative positions or possible accommodations which employers have. . . .' " ' (*Wysinger*, *supra*, 157 Cal.App.4th at p. 425.) However, as the *Nadaf–Rahrov*

24

court explained, once the parties have engaged in the litigation process, to prevail, the employee must be able to identify an available accommodation the interactive process should have produced: 'Section 12940[, subdivision] (n), which requires proof of failure to engage in the interactive process, is the appropriate cause of action where the employee is unable to identify a specific, available reasonable accommodation while in the workplace and the employer fails to engage in a good faith interactive process to help identify one, but the employee is able to identify a specific, available reasonable accommodation through the litigation process.' (*Nadaf–Rahrov, supra*, 166 Cal.App.4th at p. 984.)" (*Scotch, supra*, 173 Cal.App.4th at pp. 1018–1019.)

*Scotch* went on to note that the parties there had engaged in "extensive and thorough discovery," and "[v]oluminous summary judgment papers were prepared and filed," yet the plaintiff had identified only one proposed accommodation, which the court found to be unreasonable. (*Id.* at p. 1019.) Thus, summary judgment was properly granted to the employer on plaintiff's interactive process claim.[4] (*Ibid.*)

So too here. Brown likewise went through discovery, extensive summary judgment briefing, and now this appeal, all without identifying a single reasonable accommodation the City should have provided during the interactive process. Nor is this a case, like *Claudio*, where the employer's

---

[4] "Put another way, if this case were presented to a jury, what remedy could it provide? How was Scotch damaged by any failure by [defendant] to engage in the interactive process in good faith? The FEHA has a remedial rather than punitive purpose. (§ 12920; see *Nadaf–Rahrov, supra*, 166 Cal.App.4th at pp. 981–982.) Unless, after litigation with full discovery, Scotch identifies a reasonable accommodation that was objectively available during the interactive process, he has suffered no remedial injury from any violation of section 12940, subdivision (n)." (*Scotch, supra*, 173 Cal.App.4th at p. 1019.)

failure to conduct the interactive process prevented Brown from knowing what accommodations were possible. (See *Claudio*, *supra*, 134 Cal.App.4th at p. 249; *Nadaf–Rahrov*, *supra*, 166 Cal.App.4th at p. 984.) It is undisputed that Brown and the City engaged in a six-month interactive process, a process that involved at least one in-person meeting, the City's weekly provision of all available job listings, and the evaluation of Brown for several vacant available positions. Under these circumstances, summary judgment was properly granted to the City on Brown's claim for failure to engage in the interactive process.

**The Trial Court Did Not Abuse Its Discretion in Denying Leave to Amend**

On April 22, 2019, the day before the hearing on the City's motion for summary judgment, Brown sought leave to file a first amended complaint, to assert a new cause of action for disability discrimination under section 12940, subdivision (a), alleging that the City "refused to engage in a good faith interactive process and accommodate Plaintiff because of its 100 healed [*sic*] policy." Brown alleged that he had discovered the 100-percent healed policy "less than 2 months ago," including in the March 8, 2019 deposition of Mary Baptiste.

Brown's proposed first amended complaint also sought to add the allegation that he was "regarded and treated as disabled" by the City to the allegation that he had a qualifying disability in his two existing causes of action, alleging that the City had for the first time in its motion for summary judgment "raise[d] the defense that Plaintiff was not disabled."

After a hearing, the trial court entered a lengthy written order denying the motion, holding as follows:

"Here, Plaintiff Kevin Brown is seeking leave to amend in two areas: (1) adding a cause of action for disability discrimination based on Defendant

26

City of Oakland's alleged '100-percent-healed' policy, and (2) adding 'regarded and treated as disabled' allegations to Plaintiff's existing causes of action for failure to accommodate and failure to engage in the interactive process.

"NEW CAUSE OF ACTION FOR DISABILITY DISCRIMINATION

"Defendant would suffer prejudice if Plaintiff were permitted to add a cause of action at this juncture. Case law supports Defendant's position that interfering with a motion for summary judgment is prejudicial. (See *Melican v. Regents of Univ. of Cal.* (2005) 151 Cal.App.4th 168, 175–176; *Falcon v. Long Beach Genetics, Inc.* (2014) 224 Cal.App.4th 1263, 1280–1281; *Huff v. Wilkins* (2006) 138 Cal.App.4th 732, 746; see also *A.N.* [*v. County of Los Angeles* (2009)] 171 Cal.App.4th [1058,] 1068 [finding prejudice where trial date is near].) Here, Plaintiff initially included a disability discrimination cause of action in his Complaint. Then, shortly before Defendant's motion for summary judgment was filed, Plaintiff abandoned the cause of action and did not fully respond to written discovery on the topic. Now that Defendant's motion for summary judgment has been heard, Plaintiff seeks to add a disability discrimination cause of action back into the lawsuit. Allowing Plaintiff to do so now would prevent Defendant from pursuing a pre-trial dispositive motion on the cause of action, and, as discovery is closing, would not permit Defendant to seek discovery on this issue, discovery that was previously refused by Plaintiff on the basis that the cause of action was no longer going to be pursued. While the Court will not guess Plaintiff's motivations, the sequence of events gives Plaintiff's attempt to amend on this issue the unsightly appearance of gamesmanship to avoid summary judgment. The Court will not countenance dismissing and reinserting causes of action shortly before trial.

27

"Plaintiff argues that he has not shown substantial delay in seeking this amendment regarding disability discrimination. As argued in Plaintiff's reply, the facts that have brought Plaintiff to seek to reintroduce a disability discrimination claim, those involving Defendant's alleged '100-percent-healed' policy, did not specifically come to light until various depositions were taken in early 2019. This may be true, but the delay analysis on this claim is complicated by the fact that Plaintiff actually had a disability discrimination cause of action in the Complaint and then, after leaving it there for many months, voluntarily removed it, and is now seeking to include it in the FAC. The timeline here, by Plaintiffs doing, is not as straightforward as learning new facts and seeking prompt amendment. In any case, the prejudice to Defendant here is high, the loss of adjudicating the claim on summary judgment and seeking discovery, and therefore the evidence of delay need not be overwhelming or even compelling.

"Accordingly, in regards to Plaintiff's request to add a cause of action for disability discrimination to the FAC based on Defendant's alleged '100-percent-healed' policy, Plaintiffs motion is DENIED.

"'REGARDED AND TREATED AS DISABLED' ALLEGATIONS

"Plaintiff would also like to add allegations to each existing cause of action that Plaintiff is not only disabled, but 'regarded and treated as disabled' by Defendant. As to this request, Plaintiff's motion is DENIED AS MOOT. Summary judgment was granted in this motion, and the absence of 'regarded or treated as' language in the Complaint was not a basis for doing so and would have no bearing on the motion. Furthermore, to the extent the language Plaintiff intends to insert has not been mooted by the motion for summary judgment, the same arguments addressed above in regards to prejudice and delay also apply here."

**Applicable Law and Standard of Review**

The statutes authorizing amendment of pleadings are "construed liberally so that cases might be tried upon their merits in one trial where no prejudice to the opposing party or parties is demonstrated." (*Rainer v. Community Memorial Hosp.* (1971) 18 Cal.App.3d 240, 254; *Trafton v. Youngblood* (1968) 69 Cal.2d 17, 31.) This liberal policy applies to amendments " 'at any stage of the proceedings, up to and including trial,' " but with one caveat—it must be without prejudice to the adverse party. (*Atkinson v. Elk Corp.* (2003) 109 Cal.App.4th 739, 761; see *Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 354–355.) And as one court put it: " ' "[E]ven if a good amendment is proposed in proper form, unwarranted delay in presenting it may—of itself—be a valid reason for denial." ' " (*Emerald Bay Community Assn. v. Golden Eagle Ins. Corp.* (2005) 130 Cal.App.4th 1078, 1097; *Duchrow v. Forrest* (2013) 215 Cal.App.4th 1359, 1377–1378; *P & D Consultants, Inc. v. City of Carlsbad* (2010) 190 Cal.App.4th 1332, 1345; see also *City of Stanton v. Cox* (1989) 207 Cal.App.3d 1557, 1564 ["A party who waits 18 months before attempting to amend, and then does so only after trial has commenced, and who offers no excuse for the failure, can hardly complain when the request to amend is denied"].)

Resolution of the competing interests in liberality of amendment and avoiding prejudice or delay rests in the sound discretion of the trial court, and is subject to reversal only for abuse of that discretion. (*Consolidated World Investments, Inc. v. Lido Preferred Ltd.* (1992) 9 Cal.App.4th 373, 383; *Duchrow v. Forrest, supra*, 215 Cal.App.4th at p. 1378.) Brown has shown none.

Brown argues that the trial court abused its discretion in denying him leave to amend, again noting that he did not discover the facts regarding the alleged "100-percent healed" policy until depositions which took place on February 28 and March 8 of 2019, which explains his delay in seeking the amendment. But as the trial court noted, this is not a typical case of a party discovering new facts and seeking prompt amendment, because Brown had previously dismissed the disability discrimination cause of action and for that reason did not produce discovery on it. And it does not explain why Brown, who had the facts underlying this new claim by March 8, filed a response to the City's motion for summary judgment without mentioning it, seeking to add the new claim some six weeks later—just before the hearing on the City's motion.

Even more importantly, the amendment would clearly prejudice the City, because it came after the close of discovery, after the dispositive motion deadline, and after the City's motion for summary judgment had been fully briefed and was about to be decided. Brown's new claim was based on the testimony of certain City employees about their understanding of City policy. By waiting until after the close of discovery and after the dispositive motion deadline to seek leave to amend, Brown deprived the City of the opportunity to "marshal[] evidence to oppose the contention" that such a policy existed, and to move for summary judgment accordingly. (*Magpali v. Farmers Group, Inc.* (1996) 48 Cal.App.4th 471, 487; see *Melican v. Regents of University of California*, *supra*, 151 Cal.App.4th at p. 176 [no abuse of discretion in denying oral motion to amend at hearing on summary judgment because "[i]t would be patently unfair to allow plaintiffs to defeat [defendant]'s summary judgment motion by allowing them to present a 'moving target' unbounded by

the pleadings"].)   Under these circumstances, there was no abuse of discretion in denying leave to amend.[5]

## DISPOSITION

The judgment and the order denying leave to amend are affirmed.  The City shall recover its costs on appeal.

---

[5] Brown does not challenge the trial court's denial of his motion to the extent he sought to add "regarding as disabled" language to his two existing claims, a motion which, given our discussion of those claims, was moot.

_____

Richman, J.

We concur:

_____

Kline, P.J.

_____

Stewart, J.

*Brown v. City of Oakland* (A157706)